**UNIVERSITY OF TEXAS MEDICAL BRANCH AT GALVESTON,**
Appellant,

v.

**Robert YORK, as Guardian of Richard Allen York, N.C.M., Appellee.**

**No. 01–89–00937–CV.**

Court of Appeals of Texas,
Houston (1st Dist.).

Feb. 14, 1991.

Rehearing Denied May 2, 1991.

Mark J. Holbrook, Austin, for appellant.

John A. Buckley, Galveston, Andrew My-telka, Austin, for appellee.

Before PRICE,[1] COHEN and DUGGAN, JJ.

OPINION

PRICE, Justice.

The University of Texas Medical Branch of Galveston (UTMB) appeals a judgment awarding Robert York, as guardian for Richard York, $200,000 for UTMB's negligent use of its tangible personal property. The trial court added prejudgment interest of $50,000, increasing Richard York's damage award to $250,000, the statutory maximum for which a governmental unit can be held liable under the provisions of the Texas Tort Claims Act. TEX.CIV.PRAC. & REM. CODE ANN. § 101.021 (Vernon 1986). The Yorks cross-appeal seeking, among other relief, postjudgment interest.

In 1982, Richard was involved in an accident that caused severe brain damage leaving him partially paralyzed and functionally impaired. He began and continued a course of rehabilitation, through therapy, that eventually took him to UTMB as an inpatient in its special care unit for adults. Previously, Richard had been treated by the therapists at UTMB on an outpatient basis. He responded so well to the therapy that the physicians and therapists thought that the more intensive program offered to the UTMB's inpatients would hasten his recovery, and they believed that eventually he would be able to reside in a group home. Richard was admitted into the hospital on August 13, 1984.

Shortly after arriving at the hospital, Richard broke his right hip. It is unknown when or how this occurred; however, Dr. Cierny, the doctor in charge of Richard, admitted in a letter to CNA Insurance Companies that it occurred after Richard entered the special care unit at the hospital. The first indication that something was wrong was observed by Richard's parents during a visit on August 14, 1984.

They noticed scratches on Richard's right arm and a missing support from the right side of his wheelchair. These observations were reported to the duty nurse but were never recorded in the progress notes of Richard's medical chart.

As the days progressed, Richard's problem with his right hip became more noticeable to Ms. York. His hip became red and swollen. The pain he suffered was so intense that he would cry and scream when touched or moved. He began to withdraw from being the happy, eager person he once was to one who refused to communicate or respond to his parents' care. His eating habits were also affected; at times he refused to eat. The nurses became concerned with his abrupt change in attitude. Ms. York requested of the nurses that these observations of Richard, reflecting his severe change in condition, be noted in Richard's charts, but the entries were never made. Some of Richard's changed conditions, however, were noted in his medical chart.

When the staff became concerned enough with Richard's condition, Dr. Milner, a psychiatrist completing her neurology residency, was called in to examine Richard's hip. She diagnosed his problem as a muscle strain caused by therapy. She was called back to examine the hip on four subsequent occasions and never changed her opinion.

According to the records, as time went on Richard's condition worsened. He was not responding to therapy. He was retrogressing in his rehabilitation efforts instead of progressing. On August 17, Richard's physical therapist made a note on his chart recommending that the doctors order an x-ray of Richard's right hip. The x-ray was not ordered until August 21, and not taken until August 22.

Testimony from two physicians, Evans and Longsjoen, established that a physician cannot make a reliable diagnosis of an injury merely by reading the medical records,

1. The Honorable Frank C. Price, former justice, Court of Appeals, First District of Texas at    Houston, sitting by assignment.

but the records will tend to infer or suggest a particular problem. Evans testified that it was not good medical practice to wait five days after an x-ray has been recommended before it is taken.

At the close of the evidence, the trial court submitted, over UTMB's objection, the first special issue as follows:

Do you find from a preponderance of the evidence that the UTMB was negligent, and that such negligence, if any, was caused by the use or condition of tangible personal property which was the proximate cause of the damages to Richard York?

The term "use" as used herein means to put or bring into action or service; to employ for or apply to a given purpose. In answering this question you are limited to the following tangible personal property and none other.

Answer "yes" or "no"    yes  no
a) wheelchair        —  —
b) keeping of files, records  —  — or other documentation

The jury answered "no" to the wheelchair and "yes" to the keeping of files, records, or other documentation.

■ In two points of error, UTMB challenges the quality of the evidence to support the jury's finding. The first point of error asserts that the trial court erred in submitting question 1(b) because there was no evidence to support an affirmative answer by the jury that the keeping of files, records, or other documentation was a proximate cause of Richard's damage. The second point of error claims the evidence was insufficient to support an affirmative finding to question 1(b).

UTMB maintains that a finding of no evidence necessarily means there is insufficient evidence. We are not directed to any reference in the record where UTMB claims the evidence is insufficient to support the verdict, nor does UTMB make any argument to suggest they are predicating any part of its appeal on this sufficiency ground. Without an adequate discussion of the record, UTMB cannot maintain its second point of error. TEX.R.APP.P. 74(d). Therefore, we will direct our attention only to the no evidence issue asserted in the first point of error.

In reviewing a "no evidence" point, we will consider only the evidence and inferences that, when viewed in their most favorable light, tend to support the finding, and will disregard all evidence and inferences to the contrary. *Davis v. City of San Antonio,* 752 S.W.2d 518, 522 (Tex. 1988). If there is more than a scintilla of evidence of probative force to support the finding, the point must be overruled and the finding upheld. *Sherman v. First Nat'l Bank,* 760 S.W.2d 240, 242 (Tex. 1988).

UTMB makes a two-pronged attack in urging its no evidence issue. First, it claims that the failure to record an essential entry into one's medical chart is not a "use" of tangible personal property, and thus, will not support a cause of action under the provisions of the Texas Tort Claims Act. Secondly, it maintains there is no evidence that the keeping of files, records, and other documentation was the proximate cause of Richard York's injuries.

The Texas Tort Claims Act provides: "A governmental unit in the state is liable for ... personal injury and death so caused by a condition or use of tangible personal or real property if the governmental unit would, were it a private person, be liable to the claimant according to Texas law." TEX. CIV.PRAC. & REM.CODE ANN. § 101.021 (Vernon 1986). "Use" in the context of the Act has been defined as "to put or bring into action or service; to employ for or apply to a given purpose." *Salcedo v. El Paso Hosp. Dist.,* 659 S.W.2d 30, 33 (Tex.1983).

Richard's damages were predicated on UTMB's negligent use of medical records that resulted in a failure of the doctor to timely diagnose Richard's fractured hip. The Yorks put great emphasis on the claim that the hospital and its staff were negligent in not recording on Richard's chart, the events of August 14, the date the Yorks maintain the injury occurred, as well as the observations made by the Yorks on various other occasions. According to the Yorks, if these events had been recorded it would have been a simple matter for a

physician to diagnose the problem with Richard's hip and order an x-ray.

UTMB counters Richard's claim by arguing that the failure to record information in a medical chart is tantamount to a "nonuse" of property and cannot bring this case within the statutory waiver of immunity arising from some condition or "use" of personal property. To support its claim, UTMB relies on *Montoya v. John Peter Smith Hospital*, 760 S.W.2d 361 (Tex.App.—Fort Worth 1988, writ denied). In *Montoya*, an admitting nurse was required to fill out a triage slip reflecting an incoming patient's medical status so that the emergency room can prioritize its patients on a need for treatment basis. *Id.* at 363. The nurse failed to fill out such a slip and Montoya died. *Id.* The court held that the definition of "use" in the Texas Tort Claims Act excludes "nonuse" or failure to use property and that such an allegation would not state a cause of action. *Id.*

In the present case, we are not concerned with a chart that has no entries, but one that has incomplete entries. Some entries were recorded and some were not. The Yorks claim that without the additional entries, the failure to make timely, accurate diagnosis was a negligent use of the medical charts. To support this position, the Yorks cite *Robinson v. Central Texas MHMR Center*, 780 S.W.2d 169 (Tex.1989).

In *Robinson*, recovery was allowed when death by drowning occurred after employees at a state mental health center failed to provide a patient with a life preserver as part of the issued swimming attire. 780 S.W.2d at 171. The court in *Robinson* based its decision on the previously decided supreme court case of *Lowe v. Texas Tech University*, 540 S.W.2d 297 (Tex.1976). In *Lowe*, the plaintiff's knee was injured when he was playing football without wearing knee braces. *Lowe*, 540 S.W.2d at 300. The *Lowe* court characterized the football uniform as defective due to the failure to furnish protective equipment as part of that uniform, stating:

Both the standard and specially designed protective devices are integral parts of the football uniform.... So we also hold that Lowe's allegations of a negligent failure to furnish him proper protective items of personal property, to be used as a part of the uniform furnished him, bring his case within the statutory waiver of immunity....

*Id.*

Based on the decisions in *Lowe* and *Robinson*, the failure to record critical information in one's medical chart is actionable under the failure to use requirement of the Tort Claims Act. However, this case can be analyzed and decided under the holding in *Salcedo v. El Paso Hospital District*, 659 S.W.2d 30 (Tex.1983). In *Salcedo*, the plaintiff's husband was given an electrocardiogram in the hospital emergency room and released, even though the results of the test allegedly showed a heart attack. He died shortly after returning home. *Id.* at 31. The *Salcedo* court held that the allegations that the doctor misused the electrocardiogram graphs by improperly reading and interpreting them, stated a cause of action for the negligent use of tangible personal property. *Id.* at 32–33.

UTMB claims that the misuse of the medical charts and records was not a proximate cause of Richard's injuries because a fracture cannot be diagnosed by medical records. Instead, UTMB blames Dr. Milner for being unable to recognize the signs and symptoms of a fracture.

We have examined Richard's medical chart that covered the days of August 13 through August 22, and find that it contains many entries that record Richard's deteriorating physical condition for that period. Richard's medical chart documents a change in condition from one who, prior to entering the program at UTMB, smiled and laughed frequently and responded well to therapy, to one who became nonresponsive to family and hospital staff members, who refused therapy and who was described as being "on the verge of tears." The records reflect a rapid decline in the condition of Richard's right hip and his corresponding change in attitude toward his parents and his therapist. The red, swollen condition of his right hip was noted frequently. The

pain in his hip, evidenced by touching and moving, was also recorded.

The chart made several references to Richard's refusal, during the period in question, to sit up straight in his wheelchair. Richard would constantly lean over and support himself on the right side of his wheelchair, sometimes by as much as 90 degrees. Sores developed on his right elbow from the constant pressure of leaning. The hospital staff devoted much energy in trying to force Richard to sit up straight by strapping him in the wheelchair in an upright position. Those efforts were mostly unsuccessful as Richard would continue to lean over to the right. A reasonable inference could be drawn from Richard's efforts to lean over on the right side of his wheelchair that he was trying to alleviate pain caused by the pressure on his right hip while in a sitting position.

Richard's rapidly declining condition was severe enough that a physician was called in on five separate occasions, each time to examine Richard's right hip. Dr. Milner examined Richard on each occasion and determined that the problem with Richard's right hip was nothing more than a strained muscle, probably caused by his therapy.

On August 17, one of Richard's therapists observed the change in his physical condition and his retrogressing attitude, and recommended an x-ray. Dr. Milner still neglected to order an x-ray. It was not until August 22 that an x-ray was taken revealing Richard's broken right hip.

Doctors Evans and Longsjoen both admitted that medical records tend to infer or suggest the existence of a particular problem. Longsjoen stated that an accurate diagnosis requires the use of an x-ray. Evans testified it is not good medical practice to wait five days after an x-ray has been recommended before it is taken.

A physician's diagnosis is based, in part, on a history taken from a patient. Hospital charts and records on individual patients, updated regularly by professional staff members, are probably the most accurate method of documenting a history. With Richard's inability to communicate, the medical records became even more significant. A physical therapist who saw Richard regularly, both as an outpatient and an inpatient, noticed a rapid radical change in his physical and mental condition, thus prompting the therapist to recommend an x-ray. This recommendation, in addition to the other entries in the chart, should have indicated to Dr. Milner that an x-ray was needed in order to make an accurate diagnosis.

We may only speculate whether the jury based its verdict on the fact that Dr. Milner misused the records by waiting so long after the recommendation before ordering an x-ray in light of the other entries in the chart. We do know, however, that more than a scintilla of evidence exists to show that the misuse of Richard's medical charts, by not properly interpreting them, was a proximate cause of his damages. Thus, UTMB's first point of error is overruled. *See City of Houston v. Arney*, 680 S.W.2d 867, 874 (Tex.App.—Houston [1st Dist.] 1984, no writ) (a doctor's failure to inform a patient that her pap smear revealed a precancerous condition was a use of a tangible personal property upon which substantive law will give relief under the Texas Tort Claims Act).

■ The Yorks bring seven cross-points, the first of which claims that the trial court erred in granting an instructed verdict on the issue of bystander liability. The claim asserts that Robert York, Richard's father, should be allowed to recover damages under the theory of bystander liability because he was in close proximity during the time the injuries were sustained, and his shock was the result of a direct emotional impact from the sensory and contemporaneous observation of the situation that caused the injuries. We are not directed to any references in the record where the evidence establishes the elements of bystander liability, namely that Robert York suffered mental anguish. Thus this issue is not properly before this court. Tex.R. App.P. 74(d).

The first cross-point is overruled.

■ Robert, in his second cross-point, complains that the trial court erred in ap-

plying the Texas Tort Claims Act to his case because the services provided to Richard by UTMB constituted a proprietary function rather than a governmental function, and therefore such application was unconstitutional.

The governmental-proprietary function distinction is of no importance since we are dealing with a state agency. Robert, in his original petition, names the state of Texas and the University of Texas System, as governmental entities by and through the University of Texas Medical Branch at Galveston, as defendants in the lawsuit. The state and its agencies are generally considered to always perform governmental functions. *Jose v. Texas Tech. Univ.*, 540 S.W.2d 297, 298 (Tex.1976); *Dobbins v. Texas Turnpike Auth.*, 496 S.W.2d 744, 747 (Tex.Civ.App.—Texarkana 1973, writ ref'd n.r.e.); *see also Turney v. City of Houston*, 602 S.W.2d 517, 519 (Tex.1980). Thus, the only proper method of bringing a cause of action against a state agency would be to sue under the Texas Tort Claims Act. Tex.Civ.Prac. & Rem.Code Ann. § 101.021 (Vernon 1986).

The second cross-point is overruled.

In his third cross-point, Robert contends that the trial court erred in applying the Texas Tort Claims Act to the present case because the Act is unconstitutional as violative of provisions of the United States and Texas Constitutions. He claims that the doctrine of sovereign immunity no longer bears a rational relationship to its original purpose. Robert is relying on the language in *Tarrant County Hospital District v. Ray*, 712 S.W.2d 271, 273 (Tex.App.—Fort Worth 1986, writ ref'd n.r.e.). The court in *Ray* held the Act was constitutional. It states that the "constitutional safeguard is offended only if the classification rests on grounds wholly irrelevant to the achievement of the State's objective." *Id.* Robert contends that the state's original objective is no longer viable in today's modern economy. We disagree and subscribe to the same philosophy as the *Ray* court. The task of reexamining liability or waiving the doctrine of sovereign immunity belongs to the legislature, not this Court.

Further, the Texas Tort Claims Act has been upheld as constitutional by the Texas courts. *Tarrant County Water Control v. Crossland*, 781 S.W.2d 427, 439 (Tex.App.—Fort Worth 1989, no writ); *Stout v. Grand Prairie Indep. School Dist.*, 733 S.W.2d 290, 296–98 (Tex.App.—Dallas 1987, writ ref'd n.r.e.).

We overrule cross-point number three.

■ Robert brings cross-point number five in two parts. First, Robert claims that the trial court erred in denying him postjudgment interest. Secondly, Robert claims the trial court erred in denying damages in excess of $250,000 where the Yorks, prior to trial, offered to settle against UTMB within the maximum limits set by the Tort Claims Act.

The jury awarded $200,000 to Robert for his damages. The trial judge added $50,000 as prejudgment interest, bringing the amount of damages awarded to Robert to the $250,000 maximum limit set by the Tort Claims Act. Tex.Civ.Prac. & Rem.Code Ann. § 101.023 (Vernon 1986). The trial court denied postjudgment interest.

Robert asserts that by capping the prejudgment interest at $50,000, the trial court denied him an additional $70,000 of prejudgment interest to which he would have been entitled if there had been no statutory maximum. Further, he would be denied approximately $65,000 of additional interest if this case goes its full appellate cycle and he is successful on appeal. Robert argues that since he offered to settle with UTMB within the limits of the Texas Tort Claims Act, and UTMB refused to settle, he should be allowed to recover an amount in excess of the limit set by the Act. He bases this premise on *G.A. Stowers Furniture Co. v. American Indemnity Co.*, 15 S.W.2d 544 (Tex.Comm'n App.1929, holding approved). In *Stowers*, the court allowed a plaintiff to recover an amount exceeding insurance coverage when the plaintiff attempted to settle the case within the limits of the insurance policy. *Id.* at 545. Robert cites no cases, and our research has revealed none, that extend the *Stowers* doctrine to a statutory limitation of damages. Further, the Texas Supreme Court upheld

the damages limitation of the Act in *Weller v. State*, 682 S.W.2d 234, 234 (Tex.1984).

■ Robert's claim for postjudgment interest presents a different question. Postjudgment interest, unlike prejudgment interest, is not an element of the measure of damages in a personal injury case. Instead, postjudgment interest is compensation allowed by law for the use or detention of money computed from the date of the rendition of a judgment until the date of its satisfaction. TEX.REV.CIV.STAT.ANN. art. 5069–1.05, § 3(a) (Vernon Supp.1991). Interest as interest in such a situation is an incident of debt, and to be payable it requires an obligation binding on one person to pay money to another. Once the debt is established, unless there is an agreement as to when it is to be satisfied, the obligation to pay is immediate. Failure of the obligor to promptly pay deprives the obligee of the right to invest and earn interest on his money. The obligor benefits from the use of the money while the obligee does not. Thus, the award of interest on money owed is the only compensation available to the obligee who cannot enjoy the benefits of his own money.

The Texas Tort Claims Act limits the amount of damages one can recover from a governmental unit for a personal injury claim. Once the claim is proven and the damages established, so long as the damages do not exceed the maximum authorized by statute, the obligation to pay is the same as that of any other debtor. The Act does not permit the sovereign to withhold payment once the debt is established.

In the present case, Richard received the statutory maximum of $250,000 for his injuries caused by the negligence of UTMB. He asks for postjudgment interest pursuant to the provision of TEX.REV.CIV.STAT. ANN. art. 5069–1.05, § 3(a) (Vernon Supp. 1991). To deny this request is to allow UTMB to keep control of the money for however long it desires, depriving the Yorks, who have no recourse, the benefit and use of what is now their money. In other words, there is no incentive for UTMB to pay the Yorks the money that belongs to them. Because postjudgment interest is not considered to be damages, it does not affect the statutory amount controlled by the Tort Claims Act. Thus, we can find no reason why postjudgment interest should not be awarded. *See Weller*, 682 S.W.2d at 234.

We sustain that portion of York's crosspoint number five complaining about the trial court's failure to award postjudgment interest, and reform that the trial court's judgment to reflect the award of postjudgment interest beginning from the date of judgment, August 8, 1989, pursuant to the provisions of TEX.REV.CIV.STAT.ANN. art. 5069–1.05 § 3(a) (Vernon Supp.1991), until paid.

We find it unnecessary to address Robert's crosspoints numbers four, six, and seven.

As reformed to include the award of postjudgment interest, the judgment is affirmed.