Roger Wayne WHEELER and Barbara Jo Wheeler, Appellants,

v.

YETTIE KERSTING MEMORIAL HOSPITAL, Sergio Rodriguez, M.D., M. Davison, R.N., S. Colvin, R.N., University of Texas Medical Branch–Galveston, John Sealy Hospital, Life Support Team, Jerry Russell Davis, and Ernest Koehler, Appellees.

No. 01–92–00609–CV.

Court of Appeals of Texas, Houston (1st District).

April 29, 1993.

Rehearing Denied Oct. 14, 1993.

Les Cochran, Virginia A. Barry, Houston, for appellants.

Alice M. Giessel, H. Kent Twining, Giessel, Stone, Barker & Lyman, Houston, for appellees.

Before PRICE, COHEN and MIRABAL, JJ.

## OPINION

PRICE, Justice.*

This is an appeal from four separate summary judgments granted in favor of the appellees, Yettie Kersting Memorial Hospital, Dr. Sergio Rodriguez, Nurses Michele Davison and Sylvia Colvin, Life Support Team and its emergency medical technicians ("EMTs") J.R. Davis and Ernest Koehler, University of Texas Medical Branch ("UTMB"), and John Sealy Hospital against the appellants Roger Wayne Wheeler and Barbara Jo Wheeler (the Wheelers). It is the second such appeal in this medical malpractice suit.

On November 30, 1984, Barbara Wheeler, then in the eighth month of her third pregnancy, contacted the Life Support Team, consisting of EMTs Davis and Koehler, to transport her to John Sealy Hospital ("John Sealy") in Galveston, approximately 90 miles away. The EMT team first took her to Yettie Kersting Memorial Hospital in Liberty ("Yettie Kersting" or "YK"), the nearest medical facility, for a medical assessment to determine whether she could successfully make the trip to John Sealy. EMT Koehler expressed doubt that Mrs. Wheeler could make it to Galveston without giving birth enroute.

When Mrs. Wheeler arrived at Yettie Kersting at approximately 3:10 p.m.,[1] Nurses Davison and Colvin ("the Nurses") assessed her condition as "dilated 4 cm., 70% effaced with bulging membranes, and the fetus at −2 station." This assessment was communicated by telephone to Dr. Sergio Rodriguez, a general practitioner with staff privileges, who was on call that day. Nurse Colvin also called John Sealy and gave the same information to an unidentified doctor there. The John Sealy doctor instructed the nurse to send the patient to Galveston on her left side.[2] Dr. Rodriguez also approved the transfer.

The EMTs, however, expressed hesitancy and concern about the patient's condition, the length of the trip, and the amount of traffic they were likely to encounter. Their stated concern involved in part their understanding that 4 cm. was a cut-off point and, according to hospital guidelines, patients dilated that far should not be transferred. However, the EMTs were not authorized to make the decision. Nurse Colvin allegedly instructed them to "put the patient in the ambulance, turn on the lights and sirens and go." The nurses did not recheck Mrs. Wheeler's status before the transfer. Although still unsure of the wisdom of the decision, EMT Koehler nevertheless obeyed and went ahead with the transfer. The ambulance left Yettie Kersting at approximately 3:57 p.m., carrying Mrs. Wheeler and, at the instruction of Nurse Colvin, a second patient also bound for Galveston.

When the ambulance reached Kemah, Texas, Koehler advised Davis, the driver, that Mrs. Wheeler's water had broken, and the EMTs decided that birth was imminent. At 4:48 p.m., Davis pulled off the road, stopped in the parking lot of the Kemah Post Office, and called John Sealy Hospital for Life

---

* The Honorable Frank C. Price, former justice, Court of Appeals, First District of Texas at Houston, sitting by assignment.

1. There is conflicting information in the record regarding the amount of time that Mrs. Wheeler was at Yettie Kersting Hospital. For example, some documents indicate that she arrived at 2:35.

2. Nurse Colvin stated that she told the John Sealy doctor she was concerned that Mrs. Wheeler's blood pressure was high. He instructed her to re-take the BP with the patient on her left side.

Flight. Because Mrs. Wheeler was having contractions and the fetus was not coming out of the birth canal, EMT Davis decided to tear open the amniotic sac so the baby wouldn't "drown in the amniotic fluid." Several minutes later, the baby, a boy, presented in a frank breech position (buttocks first). He was delivered up to the neck with good color and extremities moving, at which point Mrs. Wheeler's cervix clamped down around the baby's neck (a common complication of breech birth) and the birth process stopped. The baby slowly became cyanotic and suffocated to death. Neither Koehler nor Davis intervened in any attempt to save the baby's life.

At approximately 5:13, when the Life Flight helicopter arrived, the emergency team found EMT Koehler supporting the baby's body, its head and neck still inside the womb. After noting that the baby's limbs were cyanotic and limp, the Life Flight nurse completed the delivery. The baby's head was delivered with the umbilical cord wrapped around its neck. In spite of attempts at resuscitation, the baby was pronounced dead on arrival at John Sealy Hospital. Cause of death was listed as "anoxia due to interruption of the fetoplacental circulation by trapping of the umbilical cord between the cervix and the fetal head during the prolonged breech delivery."

The Wheelers filed suit seeking damages for the wrongful death of their child and alleging common law causes of action. The defendants moved for summary judgment only on the wrongful death claim. However, the trial court granted a final summary judgment in favor of the defendants on all causes of action. This Court affirmed the summary judgment in part, holding that the stillbirth precluded a statutory wrongful death suit. *Wheeler v. Yettie Kersting Memorial Hosp.,* 761 S.W.2d 785, 786 (Tex.App.—Houston [1st Dist.] 1988, writ denied) ("*Wheeler I* ").

However, we reversed the summary judgment on all other causes of action pleaded by the Wheelers and remanded for trial. *Id.* at 786–87. The case reaches us again on appeal of summary judgments granted in favor of the appellees on all the Wheelers' remaining causes of action.[3] The Wheelers raise 15 points of error.

**Standard of Review**

■ The standard of review of all four summary judgments is the same. The defendant, as movant for summary judgment, bears the burden to conclusively disprove as a matter of law one or more of the elements essential to each of the plaintiff's claims. *Anderson v. Snider,* 808 S.W.2d 54, 55 (Tex. 1991); *Pinckley v. Gallegos,* 740 S.W.2d 529, 531 (Tex.App.—San Antonio 1987, writ denied); *Wheeler v. Aldama–Luebbert,* 707 S.W.2d 213, 215 (Tex.App.—Houston [1st Dist.] 1986, no writ).[4] He may establish his right to summary judgment on the uncontroverted testimony of an expert witness if the subject matter is such that a trier of fact would be guided solely by the opinion testimony of experts, so long as the evidence is clear, positive and direct, otherwise credible and free from contradictions and inconsistencies, and could have been readily controverted. Tex.R.Civ.P. 166a(c). The affidavit of an interested expert who is also a party to the case can support summary judgment if it meets the requirements of rule 166a. *Anderson,* 808 S.W.2d at 55.

■ When the defendant has produced competent evidence to negate a necessary element of the plaintiff's cause of action, then the plaintiff must introduce evidence sufficient to raise a fact issue with respect to the element the defendant seeks to negate. *City of Houston v. Clear Creek Basin Auth.,* 589 S.W.2d 671, 678 (Tex.1979); *Sakowitz Inc. v. Steck,* 669 S.W.2d 105, 107–108 (Tex.1984); *Knapp v. Eppright,* 783 S.W.2d 293, 295

**3.** The Wheelers stated causes of action for medical negligence, negligent infliction of emotional distress, misrepresentation, loss of consortium, breach of the duty of good faith and fair dealing, deceptive trade practices, and invasion of privacy. The following motions for summary judgment were granted on all causes of action: (1) motion filed by Yettie Kersting Memorial Hospi-

tal and Nurses Davison and Colvin; (2) motion filed by Sergio Rodriguez, M.D.; (3) motion filed by Life Support Team, and EMTs Davis and Koehler; and (4) motion filed by UTMB and John Sealy Hospital.

**4.** The appellants in these cases are unrelated.

(Tex.App.—Houston [14th Dist.] 1989, no writ).

On review, the appellate court will take evidence favorable to the nonmovant as true and will resolve any doubts about the existence of a fact issue in the nonmovant's favor. *Nixon v. Mr. Property Management*, 690 S.W.2d 546, 548–49 (Tex.1985). If differing inferences may reasonably be drawn from the summary judgment evidence, a summary judgment should not be granted. *Nixon*, 690 S.W.2d at 549; *Ford v. Ireland*, 699 S.W.2d 587, 588–589 (Tex.App.—Texarkana 1985, no writ). The movant's own evidence may establish the existence of a genuine issue of material fact on the plaintiff's claim. *Johnston v. Vilardi*, 817 S.W.2d 794, 796–97 (Tex. App.—Houston [1st Dist.] 1991, writ denied).

## SUMMARY JUDGMENT IN FAVOR OF DR. RODRIGUEZ (Points of Error 1 and 2)

■ To recover on a medical malpractice claim, a plaintiff must establish the following essential elements: (1) a legally cognizable duty requiring the physician to conform to a certain standard of care or conduct; (2) the applicable standard of care and a breach of that standard; (3) injury; and (4) a reasonably close causal connection between the breach of the standard and the injury suffered by the plaintiff. *Pinckley*, 740 S.W.2d at 531; *Wheeler v. Aldama–Luebbert*, 707 S.W.2d at 217.

In support of their malpractice claim against Dr. Rodriguez, the Wheelers presented the affidavit of Dr. Michael Finan, an obstetrical expert, that set out the specific elements of the standard of care for a doctor in an on-call capacity at a rural hospital who proposes to transfer an obstetrical patient to a distant facility. Specifically, according to the expert, the applicable standard of care required Dr. Rodriguez to obtain sufficient information from the nurse performing the examination to accurately determine the status of the patient's labor, including but not limited to the following:

1. History of present and prior pregnancy duration and complications;

2. History of prior labor and delivery duration and complications;

3. History of gestational age at previous deliveries and infant complications;

4. Frequency, duration, and intensity of contractions;

5. Fetal well-being, as observed on the fetal monitor, or fetal heart tones following successive contractions;

6. Presenting part and position of fetus;

7. Cervical dilatation and effacement;

8. Pelvic change over time;

9. Competence of fetal membranes;

10. Maternal well-being including but not limited to signs and symptoms of labor, vital signs, and signs and symptoms of the medical complications of pregnancy.

Dr. Finan concluded that the information given to Dr. Rodriguez by the nurses was insufficient to enable Dr. Rodriguez to formulate an opinion as to whether Mrs. Wheeler could safely be transported to John Sealy Hospital. He further concluded that, had sufficient information been obtained, a reasonable, prudent physician in Dr. Rodriguez's position would not have approved the transfer. Thus, according to the Wheelers' expert, Dr. Rodriguez breached the duty he owed Mrs. Wheeler.

Dr. Rodriguez properly contends that a doctor's duty to an individual patient arises only when he establishes a doctor-patient relationship with that patient. He moved for summary judgment first on the grounds that there was no physician-patient relationship between him and Mrs. Wheeler that would give rise to any duty and hence to any liability on his part. The doctor argued further that because no such relationship existed, the Wheelers' summary judgment evidence establishing the nature of the doctor's duty was irrelevant. Alternatively, Dr. Rodriguez's motion for summary judgment asserted that even if there were a doctor-patient relationship, his conduct under the circumstances did not breach the standard of care. In support of his motion, Dr. Rodriguez presented the following summary judgment proof:

(1) excerpts from the deposition of Nurse Colvin who testified to the following: Mrs. Wheeler presented in the ER complaining of back pain and contractions; she had

requested transportation to John Sealy and she had a card entitling her to treatment there; she was taken to YK to see if she could be transported; Colvin examined her and found her dilated 4 cm., 70% effaced, −2 station; Colvin called Labor and Delivery at John Sealy Hospital and communicated the above information to a physician; he instructed her to re-take Mrs. Wheeler's blood pressure and she did so; the results were reported to the John Sealy physician who then approved Mrs. Wheeler's transfer by ambulance to Galveston. Colvin then called Dr. Rodriguez and gave him her findings; Dr. Rodriguez also approved the transfer.

(2) excerpts from the deposition of Dr. Rodriguez stating that Nurse Colvin told him that Mrs. Wheeler wanted to be transferred to John Sealy; her prenatal records were there; the physician at John Sealy had been contacted and approved the transfer; she (Colvin) had told the John Sealy doctor dilation was 3 cm.; then she said it could be 3 or 4; when Dr. Rodriguez questioned this information, Colvin said, "I believe it's three, doctor;" Dr. Rodriguez said, "Do you have any doubt ... I'll be there and check the patient;" Colvin said, "No problem;" Dr. Rodriguez released Mrs. Wheeler for transport to Galveston.

(3) excerpts from the deposition of Barbara Wheeler who testified that the EMTs told her they were taking her to Yettie Kersting, the closest hospital, because it had to be determined that she would make it to Galveston without giving birth; she did not know Dr. Rodriguez; she did not recall whether his name was mentioned on the occasion in question; the nurses at YK mentioned calling John Sealy Hospital when they informed Wheeler that they were going to transport her.

(4) affidavit of expert witness Dr. James C. Hofmann, practicing obstetrician-gynecologist in Baytown, who testified that he was familiar with the standard of care in rural East Texas settings for the treatment of obstetrical patients which he stated as follows: "At the time it was customary for nurses assigned to labor and delivery patients to evaluate labor patients who

were under consideration for transfer to another facility; and it was not unusual or beneath the standard of care, for a physician to rely on a competent nurse's assessment, as communicated over the telephone, in approving transfer of the patient. Depending on the status and progress of labor, the physician need not necessarily have come to the hospital prior to approving transfer. In this case, in view of the status and progress of the patient, as communicated to Dr. Rodriguez by the nurse, the standard of care did not require him to come to the hospital to personally examine Mrs. Wheeler. Neither was the standard of care breached by approving transfer to John Sealy, under the circumstances as reported to Dr. Rodriguez."

## Did Dr. Rodriguez establish as a matter of law the absence of a doctor-patient relationship?

A physician-patient relationship must exist before any legal duty to the patient arises on the part of the physician. *Fought v. Solce,* 821 S.W.2d 218, 220 (Tex. App.—Houston [1st Dist.] 1991, writ denied); *Childs v. Weis,* 440 S.W.2d 104, 106–107 (Tex.Civ.App.—Dallas 1969, no writ). The mere fact that a physician is "on call" does not, in itself, impose such a duty. *Fought,* 821 S.W.2d at 220; *Childs,* 440 S.W.2d at 106, 107.

Relying on this court's opinion in *Fought v. Solce,* Dr. Rodriguez argues that Mrs. Wheeler was not even aware that the nurse telephoned him; that he had no contact or connection with Mrs. Wheeler other than the one phone call from Nurse Colvin; and that his participation in that phone call did not establish a physician-patient relationship.

In *Fought,* the following facts were considered relevant in determining the existence of a doctor-patient relationship. Fought, an accident victim, was taken to the emergency room of Eastway General Hospital where he was seen by the ER physician, Gregory Hall. Hall diagnosed Fought's injury as multiple fractures of the left leg, and, after stabilizing the patient, he decided to consult with a specialist concerning further treatment.

Hall twice called Solce, who was the orthopedic specialist on call. Although Hall requested that he do so, Solce refused to come to the hospital to examine Fought. Fought was then transferred from Eastway. Fought later underwent amputation of his leg. He sued Solce and others.

In moving for summary judgment, Solce claimed that he refused to establish and did not establish a doctor-patient relationship with Fought. Fought claimed a fact issue existed concerning whether Solce had a duty to render services to him, in other words, whether he was *required* to establish such a relationship because of his "on-call" status. In determining that Solce had no such duty, this Court held that Solce's *voluntary* "on call" status did not automatically impose on him a duty to treat Fought.

Similarly, in *Childs v. Weis,* also relied upon by Dr. Rodriguez, Dr. Weis testified that when the ER nurse telephoned and told him that Childs was in the emergency room having labor pains he told the nurse to "have the girl call her doctor in Garland and see what he wanted her to do." Dr. Weis was not involved in the incident beyond that communication. *Childs,* 440 S.W.2d at 106. The issues were the same as those in *Fought,* whether Dr. Weis was obligated to see every patient who arrived for treatment at the emergency room and whether he could be held liable for refusing to respond to the call about Childs. *Id.* at 106–107. The Dallas court found it particularly significant that the only action taken by the doctor was to instruct Childs to call her own doctor in Garland. *Id.* at 106.

The issue in *Fought* and *Childs,* whether a doctor who is "on call" has an obligation to render services to a patient who presents for treatment during the period of the doctor's call, is not the same as the issue raised in the case before us. Rather, the question here is whether Dr. Rodriguez actually rendered services to Mrs. Wheeler, thus establishing a physician-patient relationship. The deposition testimony of Dr. Rodriguez established that, on the occasion in question, he had the following conversation with Nurse Colvin regarding Mrs. Wheeler:

And she said, "I have a County patient here." And I said at that time, "Sylvia, I think so I am not on County cover today." She said, "Doctor, I think so you are." I said, "Sylvia, I don't going to discuss that point, if I am or I am not. I'm going to resolve your problem in one way or the other way. What is the problem, Sylvia?" I said, "Don't worry. Go ahead. If I am on call, if I am or I am not, I will resolve your problem like I always do it in the hospital."

I think so, I am not sure, but I think so that she had spoke with the doctor in John Sealy.[5] [She said,] "I give this information to the doctor in John Sealy. The doctor in John Sealy told me put the patient on the left side and send to here." And I said, "What information you gave to the doctor in John Sealy?" She told me three centimeter, and she said, "Can be three." She said, "No, can be a three or four." I say, "I don't play in three or four. Was it three or four." "I believe it's three, Doctor. The membrane is intact, and effacement is seventy percent. And I can't reach any presentation, and I believe is minus two."

And I said, "Okay. Put in the ambulance." Before I continue, in this case and every case, I always said, "Do you have any doubt or anything, Sylvia? And I'll be there and check the patient." She said, "Doctor, no problem. Everything is correct."

 Unlike the situations in *Fought* or *Childs,* Dr. Rodriguez was not asked nor did he refuse to come in to examine the patient. Instead, he was asked to evaluate certain information and make a medical decision whether Mrs. Wheeler could safely be transferred to John Sealy. His deposition testimony indicates that he willingly agreed to do

---

5. We note that in its motion for summary judgment, John Sealy claims that under regulations promulgated by the Texas Department of Health delineating the responsibilities of transferring and receiving physicians in hospital to hospital transfers, Dr. Rodriguez was responsible for authorizing the appropriate treatment before and during the transportation of the patient. See 25 Tex.Admin.Code § 133.21. However, the regulations cited were not in effect at the time of this event. This contention will be addressed later in this opinion under the appropriate point of error.

so. We conclude that in evaluating the status of Mrs. Wheeler's labor and giving his approval, he established a doctor-patient relationship with Mrs. Wheeler and accepted the duties which flow from such a relationship, specifically the duty to comply with the applicable standard of care for a physician in an on-call capacity at a rural hospital in transferring an obstetrical patient to a distant facility.[6] Therefore, summary judgment on grounds that no physician-patient relationship existed was improper.

### Summary judgment for Dr. Rodriguez on the standard of care

■ In the trial court, Dr. Rodriguez moved for summary judgment on the alternative ground that if a doctor-patient relationship and, therefore, a duty to Mrs. Wheeler did exist, his conduct was medically appropriate and in conformance with medical standards applicable to the circumstances. Dr. Rodriguez attached the affidavit of Dr. James C. Hofmann, an expert in obstetrics, in support of his motion.

In order to obtain summary judgment on grounds that he met the standard of care as a matter of law, Dr. Rodriguez must first present the testimony of an expert to establish the applicable standard of care. *Nicholson v. Naficy*, 747 S.W.2d 3, 4–5 (Tex.App.—Houston [1st Dist.] 1987, no writ); *see also Pinckley*, 740 S.W.2d at 530–31. We find the affidavit of Dr. Hofmann deficient in this regard for two reasons.

First, Dr. Hofmann's affidavit addresses a standard of care that is not in issue by stating that Dr. Rodriguez handled Nurse Colvin's telephone call appropriately and did not violate the standard of care by relying on the nurse's assessment, as communicated by telephone, instead of going to the hospital to examine the patient himself. This standard does not address the Wheelers' allegations, which were not so narrowly focused on the doctor's failure to go to the hospital. Sec-

ond, in addressing the standard of care for a physician transferring an obstetrical patient to a distant facility, which *is* the issue raised by the Wheelers' allegations, the affidavit states only, "Neither was the standard of care breached by approving Mrs. Wheeler's transfer to John Sealy Hospital under the circumstances as reported."

Mere conclusions unsupported by facts do not constitute competent summary judgment evidence. *Anderson v. Snider*, 808 S.W.2d 54, 55 (Tex.1991); *Nicholson v. Naficy*, 747 S.W.2d 3, 4–5 (Tex.App.—Houston [1st Dist.] 1987, no writ); *see also Gonzales v. Outlar*, 829 S.W.2d 931, 934 (Tex.App.—Corpus Christi 1992, no writ) (to support summary judgment, expert's affidavit must state what the applicable standard of care is, providing a measurement by which the trier of fact can determine if the specific medical procedures and techniques used met the standard); *Trapnell v. John Hogan Interests, Inc.*, 809 S.W.2d 606, 610 (Tex.App.—Corpus Christi 1991, writ denied) (conclusory statements unsupported by facts do not constitute competent summary judgment proof). Dr. Hofmann's affidavit also fails to controvert Dr. Finan's detailed description of the relevant standard of care for a transferring physician, which was sufficient to raise fact issues on the matter. Thus it was insufficient to support summary judgment for Dr. Rodriguez on the standard of care. *Nicholson*, 747 S.W.2d at 4–5.

Accordingly, we hold that summary judgment for Dr. Rodriguez was improper. We sustain the Wheelers' first two points of error.

### SUMMARY JUDGMENT ON NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS (Points of Error 3 and 4)

#### Existence of the Cause of Action

In their third point of error, the Wheelers contend that the trial court erred in granting

---

**6.** It is axiomatic that a doctor-patient relationship may arise from, briefly exist, and be limited by the unique circumstances presented in a transfer situation. Otherwise, a hospital's requirement for physician approval of patient transfers would require the patient to subject herself to the physician's medical decision whether to transfer her without imposing any obligation on the physician to make that decision in a responsible manner. As one appellee pointed out in oral argument, the doctor-patient relationship that arises in a transfer situation is now regulated by statute. *See e.g., Burditt v. U.S. Dept. of Health & Human Serv.*, 934 F.2d 1362 (5th Cir.1991).

summary judgment on their claim for emotional distress damages proximately caused by the appellees' negligence. The appellees contend that Texas does not recognize a cause of action for negligent infliction of emotional distress under the facts of this case. This claim is controlled by the recent supreme court decision in *Boyles v. Kerr*, 855 S.W.2d 593 (Tex.1993).

■ Overruling their decision in *St. Elizabeth's Hospital v. Garrard*, 730 S.W.2d 649 (Tex.1987),[7] the supreme court concluded in *Boyles* that there is no general duty not to negligently inflict emotional distress on another. Instead, mental anguish damages should be compensated only in connection with defendant's breach of some other duty imposed by law. *Boyles*, 855 S.W.2d at 597. In other words, negligent infliction of emotional distress is no longer recognized as an independent tort, but compensation for emotional distress is recoverable as an element of damages arising from the defendants' breach of some other legal duty owed the plaintiff. *Id.*

In reaching its conclusion, the court noted that the defendants in *Garrard* breached a duty owed the plaintiffs other than the duty not to injure them emotionally.[8] And in *Hill v. Kimball*, 76 Tex. 210, 13 S.W. 59, 60 (1890), the plaintiff's recovery was based on her physical injuries, not her emotional injury.[9] However, the court was also careful to reiterate:

> [In overruling language in *Garrard*,] [w]e [ ] are not imposing a requirement that emotional distress manifest itself physically to be compensable.... Where emotional distress is a recognized element of dam-

ages for breach of a legal duty, the claimant may recover without demonstrating a physical manifestation of the emotional distress. This has long been the rule, even before *Garrard*.

855 S.W.2d at 598. Thus, the court specifically clarified its continued rejection of the requirement that a plaintiff show some physical injury in order to recover damages for emotional distress.

■ Here, the Wheelers have stated a claim for emotional distress damages arising from the medical malpractice and other negligent acts[10] alleged to have been committed against Mrs. Wheeler by the defendants. Under the holding in *Boyles*, this claim is alive and well in Texas. The appellees' complaints that the Wheelers do not allege a physical injury are without merit. *Boyles* reconfirms that physical injury to Mrs. Wheeler is not required.

## A Wrongful Death Claim in Disguise?

■ Pointing out that summary judgment was granted in their favor at a time when plaintiffs were proceeding under their fourth amended petition, Yettie Kersting Hospital and Nurses Davison and Colvin contend that the Wheelers' emotional distress claims were properly dismissed because they were disguised wrongful death claims and, as such, were barred by the wrongful death statute. This claim was also raised in motions for summary judgment against the Wheelers' fifth amended petition, the live pleading for purposes of appeal, by appellees Life Support Team, EMTs Davis and Koehler, John Sealy Hospital, and UTMB. None of the defendants filed special exceptions to

---

7. The Court stated that "[*Garrard's*] reasoning was based on an erroneous interpretation of *Hill v. Kimball*, and is out of step with most American jurisdictions. Therefore, we overrule the language of *Garrard* to the extent that it recognizes an independent right to recover for negligently inflicted emotional distress." 855 S.W.2d at 595–96.

8. In *Garrard*, the plaintiffs alleged and proved that the hospital had mishandled the corpse of their stillborn baby by negligently disposing of it in an unmarked common grave without the Garrard's knowledge or consent. 730 S.W.2d at 650.

9. In *Hill*, the defendant severely beat two men in the plaintiff's yard. The strong emotional reaction experienced by the plaintiff's observation of the beatings caused her to experience a miscarriage. She sued in negligence for *her* physical injuries. 13 S.W. at 60.

10. Although the pleadings for emotional distress are separately captioned "Negligent Infliction of Emotion Distress Cause of Action," the Wheelers' fourth and fifth amended original petitions each allege more than 30 separate acts of negligence on the parts of the various defendants, any number or combination of which could support a claim for emotional distress damages.

the Wheelers' pleadings. *See Pietila v. Crites,* 851 S.W.2d 185, 186 (Tex.1993).

In its 1988 opinion, this Court pointed out that while the Wheelers' pleadings of their common law causes of action were terse and possibly deficient, the deficiency could be cured by amendment. *Wheeler I,* 761 S.W.2d at 786. Pleading defects that can be cured by amendment are properly challenged by special exceptions, not summary judgment. *Fort Bend County v. Wilson,* 825 S.W.2d 251, 253 (Tex.App.— Houston [14th Dist.] 1992, no writ). Stated another way, the protective features of special exception procedure may not be circumvented by a motion for summary judgment when the plaintiff's petition allegedly fails to state a viable cause of action. *Texas Dep't of Corrections v. Herring,* 513 S.W.2d 6, 10 (Tex.1974). Litigants must first urge special exceptions before invoking the summary judgment device. *Salcedo v. El Paso Hosp. Dist.,* 659 S.W.2d 30, 31 (Tex.1983); *Lowe v. Harris County Hosp. Dist.,* 809 S.W.2d 502, 504 (Tex.App.—Houston [14th Dist.] 1989, no writ). On appeal, in the absence of special exceptions, we construe all pleadings liberally in favor of the pleader. *Roark v. Allen,* 633 S.W.2d 804, 809 (Tex.1982).

In moving for summary judgment on the Wheelers' claim for emotional distress, the defendants focused on the holding in *Wheeler I* denying a claim for the wrongful death of a fetus and the following language in the Wheelers' fourth amended petition, which alleged that Mrs. Wheeler "suffered the *wrongful death* of her infant son and will continue to suffer severe physical pain, mental anguish and grief *due to the death of her son during birth.*"[11] This focus is unnecessarily narrow. A fair reading of both petitions—each of which is 13 pages in length—

reveals that the Wheelers seek to recover damages for the injury *to Mrs. Wheeler,* which they allege was negligently inflicted through the appellees' breaches of the applicable standards of care owed to her.[12]

In their briefs before this Court, both appellants and appellees cited the holding in *Crites v. Pietila,* 826 S.W.2d 175 (Tex.App.— El Paso 1992), *rev'd, Pietila v. Crites,* 851 S.W.2d 185 (Tex.1993), appellants for the holding that Mrs. Crites had a valid claim for mental anguish suffered because of the death of her fetus and appellees for the fact that Pietila's application for writ of error had been granted on the case. After the parties in *Wheeler* had argued their case to this Court, the supreme court issued its opinion reversing *Crites.* Appellees immediately filed a supplemental brief urging us to affirm the present case on the basis of that reversal. In reversing *Crites,* however, the supreme court clarified that while Texas does not recognize a cause of action for wrongful death of a fetus, a woman may recover emotional distress damages for torts committed against *her.*

Jill Crites was involved in an automobile accident when she was eight months pregnant. Her unborn fetus died in utero as a result of the accident. Mr. and Mrs. Crites sued Dr. Pietila alleging "negligent treatment *of the 'Crites' child'* (the unborn fetus) and physical injury to and death of the fetus as the cause of their mental anguish." 851 S.W.2d at 186 (emphasis in original). Unlike the defendants in the instant case, the Pietila defendants filed special exceptions, but, after opportunity to do so, the plaintiffs declined to amend their petition. In holding that "mental anguish damages for the parents are not recoverable when the only asserted cause of action is negligence toward the fetus," *id.,*

---

**11.** While this language appeared in the fourth amended petition, on file when Yettie Kersting moved for summary judgment, we have already pointed out that it did not negate the Wheelers' pleading of some 30 other acts of negligence. The offending language was deleted entirely from the fifth amended petition and therefore may not be grounds for the remaining summary judgments.

**12.** In oral argument, the defendants stated that Mrs. Wheeler was the defendants' patient and

would have had an independent cause of action for medical malpractice if she had sustained a physical injury such as contracting an infection during the birth. We note, however, that the *Boyles* opinion expressly reaffirms that such a *physical* injury is not required for recovery of emotional distress damages in a negligence suit. Further, Mrs. Wheeler's pleadings are broad enough to encompass a claim of physical injury, such as physical pain, suffered by her.

the supreme court focused on the defendants' argument that, "[b]ecause the Criteses did not claim that either physician improperly treated any of Jill's injuries, their claim fails as a matter of law." *Id.* The court stated:

Since the Criteses complain that their harm arose out of the doctors' negligent treatment of their unborn child, *not of Jill,* they are precluded from recovery as a matter of law because there is no wrongful death or survival cause of action for the death of a fetus.

*Id.* at 187 (emphasis added). The Wheelers, on the other hand, have pleaded multiple causes of action for the defendants' negligent treatment of Mrs. Wheeler, not the Wheeler baby.

The *Pietila* opinion also appears to clarify the significance of the supreme court's holding in *Witty v. American General Capital Distributing, Inc.,* 727 S.W.2d 503 (Tex. 1987). In *Witty,* the pregnant plaintiff suffered an on-the-job accident that caused her to lose the fetus she was carrying. In holding that there is no cause of action for the wrongful death of an unborn fetus and in denying Witty's claim for mental anguish, the court nevertheless recognized that *"[t]he mental anguish suffered by Ms. Witty is a part of the injury suffered as a result of the accident.* Such injury is covered by the provisions of the Worker's Compensation Act." [13] 727 S.W.2d at 506 (emphasis added). The *Witty* Court did not hold that Kimberly Witty had no right to assert a claim for *mental anguish arising from her personal injury.* It held that the claim existed but was precluded in Witty's case, by the Worker's Com-

pensation Act. *Witty,* 727 S.W.2d at 506. The Court's opinion in *Pietila* clarifies and reconfirms the meaning of that holding as follows:

In *Witty v. American Gen. Capital Distribs. Inc.,* 727 S.W.2d 503 (Tex.1987), this court held that Witty had *no claim* under the Wrongful Death or Survival Statutes, that *her claim for mental anguish under the common law* was barred under the Workers' Compensation Act, and that she had *no claim* for destruction of chattel.

851 S.W.2d at 187. This language indicates the supreme court's recognition that while there was no claim for wrongful death of a fetus and no claim for destruction of chattel, Witty did have a common law claim for mental anguish arising from her injuries that, under the facts of her case, was barred by the Workers' Compensation statute. The *Pietila* opinion further clarifies that this claim exists for "mental anguish as an element of damages in a common-law negligence suit" not for "mental anguish as a separate and independent claim." *Id.; see also Boyles,* 855 S.W.2d at 597. The Criteses, however, sued for mental anguish damages arising *only* from the negligent treatment and death of their fetus, not from negligent treatment of Jill. There is no such cause of action as a matter of law. *Pietila,* 851 S.W.2d at 187; *Witty,* 727 S.W.2d at 506; *Wheeler I,* 761 S.W.2d at 786. In contrast, the Wheelers stated a cognizable claim for emotional distress damages arising from Mrs. Wheeler's personal injury suffered as a result of the defendants' negligent treatment of her.[14]

---

**13.** All parties agreed and Witty judicially admitted that Witty's personal injuries were covered by the Workers' Compensation Act and her recovery was therefore limited by its provisions, which precluded a personal injury action against Witty's employer for mental anguish damages arising from the work-related injury. *See Witty v. American Gen. Capital Dist.,* 697 S.W.2d 636, 647 (Tex.App.—Houston [1st Dist.] 1985) (Cohen, J., dissenting), *rev'd,* 727 S.W.2d 503 (Tex.1987).

**14.** Although they do not recognize a cause of action for the wrongful death of a fetus, other jurisdictions have allowed recovery of the mother's emotional distress damages arising from medical malpractice that resulted in the death of her unborn child: *Giardina v. Bennett,* 111 N.J. 412, 545 A.2d 139, 140 (1988) (medical malprac-

tice causing stillbirth results in infliction of a direct injury to the mother as well as to her unborn child; even without permanent physical harm, the mother suffers severe and genuine injuries in the form of emotional distress and mental anguish); *Khan v. Hip Hosp., Inc.,* 127 Misc.2d 1063, 487 N.Y.S.2d 700, 704 (1985) (mother, whose only alleged injury was extreme pain of breech delivery, was as much a victim of the defendant's alleged malpractice as the stillborn fetus); *Sesma v. Cueto,* 129 Cal.App.3d 108, 114, 181 Cal.Rptr. 12, 15 n. 2 (4th Dist.1982) (a jury could find that a mother's perception of and concern about her medical treatment constitutes emotional distress sustained as a direct victim; it is unreasonable to label a woman in labor a "bystander" as to any injury suffered by her fetus, considering the intimate physical and psy-

Our determination of this point also negates the defendants' assertions that the Wheelers' claim is a "derivative" claim based solely on observation of harm to another and to YK's claim that the Wheelers' cause of action is a noncompensable bystander claim. Mrs. Wheeler asserts that she was a direct victim of the defendants' failure to adequately and correctly assess her medical status and their breach of the applicable standards of care in her treatment. *See Haught v. Maceluch,* 681 F.2d 291, 299–301 (5th Cir. 1982), (applying Texas law) (mother who had

"an experiential perception" of "negligently inflicted childbirth" was entitled to recover emotional distress damages);[15] *see also Burgess v. Superior Court,* 2 Cal.4th 1064, 9 Cal.Rptr.2d 615, 831 P.2d 1197 (1992) (mother was direct victim, not "bystander," for purposes of claim for emotional distress negligently inflicted by physician who entered into physician-patient relationship for her care and negligently injured child during course of delivery).[16]

We hold that the Wheelers stated a cause of action for emotional distress damages aris-

---

chic connection between them); *Johnson v. Superior Ct. of Los Angeles,* 123 Cal.App.3d 1002, 1006, 177 Cal.Rptr. 63, 65 (2d Dist.1981) (where expectant mother's alleged injuries from sensory perception of her fetus' death were shock to her nervous system and injuries to her emotional health, solution to question of bystander recovery lies not in contorting *Dillon v. Legg,* 68 Cal.2d 728, 69 Cal.Rptr. 72, 441 P.2d 912 (1968) to cover the situation but in recognizing that the emotional distress arising from the sensory impact of the death of the child is compensable as part of the mother's cause of action for medical malpractice to herself).

15. Although *Haught* was tried on an "uninjured bystander" theory, a theory not viable in the present case where the baby was not "born alive," the federal court's analysis and interpretation of Texas law, based as it was on general negligence principles (particularly foreseeability and proximate cause) in cases involving infliction of emotional distress, 681 F.2d at 296–97, is instructive on the issue of the inseparability of the pregnant mother and fetus and the nature of the mother's experience of the birth process. In defining that experience, the court opined that "not only was appellant [the mother] located near the scene of the accident, she was in some sense the scene itself," and "[the doctor's] negligent conduct was visited upon her and upon the child within her body; no closer proximity can be imagined." And the mother and child "were closely related—indeed, as a mother and child in childbirth their relationship was *unitary.*" 681 F.2d at 299 (emphasis added). The *Haught* court also stated that the mother's *experience* (eleven hours of a painful and protracted labor, her perception that something was wrong, and her fear for her child's life) as an *integral part* of the negligent event(s) was to be distinguished from a bystander's learning of an event from others after its occurrence. 681 F.2d at 301.

16. The *Burgess* opinion recognizes "the unique relationship between mother and child during pregnancy and childbirth," noting that the scope of the duty owed by a treating physician to a pregnant woman extends to the fetus and includes a duty to avoid injury to the fetus and the

emotional distress that would result to the mother from such an injury. According to the California Supreme Court, the doctor's claim in *Burgess,* that his duty to the mother was limited to avoiding injury to *her* and did not extend to the unborn fetus, erroneously presumed that the mother and fetus were two separate patients. The Court noted that to accept that argument "would require us to ignore the realities of pregnancy and childbirth. Burgess established a physician-patient relation with [the doctor] for medical care which was directed not only to her, but also to her fetus. The end purpose of this medical care may fairly be said to have been to provide treatment consistent with the applicable standard of care in order to maximize the possibility that Burgess' baby would be delivered in the condition in which he had been created and nurtured without avoidable injury to the baby or to Burgess. Moreover, during pregnancy and delivery it is axiomatic that any treatment for [the baby] necessarily implicates [the mother's] participation since access to [the baby] could only be accomplished with [the mother's] consent and with impact to her body.

"In addition to the physical connection between a woman and her fetus, there is an emotional relationship as well. The birth of a child is a miraculous occasion which is almost always eagerly anticipated and which is invested with hopes, dreams, anxiety, and fears ... [a woman] is concerned for the well-being of her child and she anticipates that her conscious participation in and observance of the birth of her child will be a wonderful and joyous occasion. [A doctor] ... surely recognizes the emotionally charged nature of pregnancy and childbirth and the concern of the pregnant woman for her future child's well-being. [The doctor] certainly knows that ... the receiving of her child into her arms for the first time is eagerly anticipated as one of the most joyous occasions of the patient's lifetime.... [F]or these reasons, the mother's emotional well-being and the health of the child are inextricably intertwined." The fact, in our case, that the defendants' duty to Mrs. Wheeler was limited to the period of her transfer does not negate the profound principles expressed in *Burgess* and the other cases noted herein.

ing from the defendants' allegedly negligent treatment of Mrs. Wheeler. Therefore, summary judgment on the Wheelers' emotional distress claim was improper. We sustain points of error three and four.

## SUMMARY JUDGMENT ON GOVERN-MENTAL/OFFICIAL IMMUNITY
### (Points of Error 5 and 6)

### Sovereign Immunity (YK, John Sealy, UTMB)

Governmental units generally are immune from tort liability unless immunity is waived under one or more of the provisions of the Texas Tort Claims Act, TEX.CIV.PRAC. & REM. CODE ANN. § 101.001 et seq. (Vernon 1986). When the governmental unit asserts its right to summary judgment on the basis of the affirmative defense of sovereign immunity, it must prove entitlement to immunity as a matter of law. *Mitchell v. Shepperd Memorial Hosp.*, 797 S.W.2d 144, 147 (Tex.App.— Austin 1990, writ denied). YK established its status as a county hospital and a political subdivision of the state protected by sovereign immunity. *Salcedo v. El Paso Hosp. Dist.*, 659 S.W.2d 30, 31 (Tex.1983); *Weeks v. Harris County Hosp. Dist.*, 785 S.W.2d 169, 170 (Tex.App.—Houston [14th Dist.] 1990, writ denied). Likewise, John Sealy and UTMB are governmental entities to which the principle of sovereign immunity applies.[17]

To avoid summary judgment on these grounds, the Wheelers were required to come forward with sufficient evidence to bring the suit within one or more of the statutory waiver provisions of the Act. *Salcedo*, 659 S.W.2d at 31; *Mitchell*, 797 S.W.2d at 147. To that end, the Wheelers argue that immunity was waived under the provisions of the Texas Tort Claims Act, TEX.CIV.PRAC. & REM.CODE ANN. § 101.021(2) (Vernon 1986), which provides as follows:

A governmental unit in this state is liable for:

. . . .

(2) personal injury and death so caused by a condition or use of tangible personal or real property if the governmental unit would, were it a private person, be liable to the claimant according to Texas law.

TEX.CIV.PRAC. & REM.CODE ANN. § 101.021(2) (Vernon 1986); *see also Salcedo*, 659 S.W.2d at 33. In other words, the proximate cause of the damages for death or personal injury must be the negligence (wrongful act or omission) of an officer or employee of the hospital(s) acting within the scope of his employment or office. *Salcedo*, 659 S.W.2d at 33. The negligent conduct also must involve "some condition or some use" of tangible property under circumstances where there would be private liability. *Id.; Lowe v. Texas Tech University*, 540 S.W.2d 297, 299 (Tex.1976). On review of the summary judgment, we liberally construe the provisions of the Act, and we accept the Wheelers' allegations as true. *Salcedo*, 659 S.W.2d at 31–32.

### Waiver of Liability of John Sealy and UTMB

In response to the motion for summary judgment by John Sealy and UTMB, the Wheelers reference their allegations that these entities, who allegedly had conducted Mrs. Wheelers' prenatal care, failed to consult or negligently consulted their medical records on Mrs. Wheeler before approving the transfer and agreeing to receive her.[18] UTMB and John Sealy contend that if there was negligence involving tangible personal property in this case, the negligence involved only the *nonuse* of property which does not trigger the waiver of liability provided by the Act.

Medical records, charts, and graphs are tangible personal property within the meaning of section 101.021(2). *Salcedo*, 659 S.W.2d at 32–33; *UTMB v. York*, 808 S.W.2d 106, 109 (Tex.App.—Houston 1991, writ granted). Failure to correctly utilize the information contained in a medical chart is

---

17. Nurses Colvin and Davison are governmental employees of the hospital and, as such, they are entitled to claim official immunity which is discussed later in this opinion. *See Mitchell*, 797 S.W.2d at 145–46.

18. The record is silent on what those records might have revealed, although Wheeler implies that they would at least have disclosed her previous history of short labor.

actionable under the waiver provision of the Tort Claims Act requiring some "use of tangible property." *Texas Dep't of Mental Retardation v. Petty*, 848 S.W.2d 680, 683 (Tex.1992); *Salcedo*, 659 S.W.2d at 33 ("use" has been defined in the context of this statute as "to put or bring into action or service; to employ for or apply to a given purpose" and includes "misuse"); *York*, 808 S.W.2d at 109–110. Thus the Wheelers have stated sufficient facts to bring their suit against John Sealy and UTMB within the waiver provision of the Act.

## Waiver of Liability of YK and the Nurses

■ In their response to the motion for summary judgment by YK and the Nurses, the Wheelers asserted the failure of those parties to use tangible equipment in assessing, recording, and communicating the status of Mrs. Wheeler's labor and the well-being of the infant.[19] They provided the affidavits of two experts, Nurse Patricia Grantom and Dr. E. Michael Finan, which specify that the failure was beneath the standard of care for a doctor and a nurse evaluating a woman such as Mrs. Wheeler. Further, according to the experts, if the nurse attempts but is unable to obtain any of the pertinent information, such as the presenting part of the fetus or the nature and frequency of contractions, the standard of care requires that the nurse inform the physician of the reason for the absence of the information. Finally, the Wheelers state that use of the telephone to communicate incorrect information constitutes a waiver of liability under the Tort Claims Act. *See Texas Dep't of Corrections v. Winters*, 765 S.W.2d 531, 532 (Tex.App.—Beaumont 1989, writ denied) (machine used to transmit erroneous message that relative

had died is tangible personal property and its misuse falls within the act).

YK acknowledges that the failure of a political subdivision to use tangible equipment can, in limited circumstances, equate to a "condition or use of tangible property" within the meaning of section 101.021(2). However, citing *Weeks v. Harris County Hospital District*, 785 S.W.2d at 171, YK insists that in a hospital setting, the exemption applies only where a hospital clearly assumes the duty of care for the injured person's well-being by admitting that individual for medical treatment. However, the rationale of *Weeks* does not apply to the situation in the case before us.

Mrs. Weeks was taken to Ben Taub Hospital under an emergency apprehension and detention warrant that ordered she be held at the hospital's in-patient mental health facility for observation and examination. However, Ben Taub has no such facility. While Mrs. Weeks awaited transfer to another facility, Ben Taub employees made no attempt to restrain or confine her. She voluntarily left the building and returned to her home where she committed suicide. Mrs. Weeks' family sued, alleging that the case came within the waiver of immunity under section 101.021(2) because of the hospital's nonuse of restraints. *Weeks*, 785 S.W.2d at 170.

In affirming summary judgment for the hospital district, the court distinguished the *Weeks* case from those cases holding that nonuse triggers the waiver provision of section 101.021(2) on the basis that where immunity was held waived, the governmental entity had assumed some duty of care for the injured individual's well-being by either preventing him from seeking alternative medical

19. We agree with the appellees that the failure of the YK Nurses to *record* information in Mrs. Wheeler's chart is distinguishable from the situation addressed by this Court in *York*. In this case, unlike *York*, there was no opportunity for medical personnel to use or rely on Mrs. Wheeler's chart from YK. Thus, we fail to see how causation could be established regarding YK's incomplete records. However, the Wheelers' pleadings *contained other* allegations of failure to use tangible equipment.

In particular, YK and the Nurses failed to use tangible equipment to determine the presenting part of the fetus or its position, or to correctly assess the station and well-being of the fetus and the frequency and strength of Mrs. Wheeler's contractions. The nurses did not use equipment to ascertain fetal heart tones following successive contractions. Neither did the nurses inform Dr. Rodriguez of the reasons for the absence of the information. No fetal monitor was used. Nurse Colvin did not discuss with Dr. Rodriguez or with the doctor at UTMB her inability to determine the baby's position or presenting part. The Nurses did not seek to obtain any information about Mrs. Wheeler's obstetrical history from John Sealy's medical records.

care, or by accepting and admitting him. *Weeks,* 785 S.W.2d at 171. The court concluded that in Mrs. Weeks' case, the hospital district had done neither. The court's focus in this analysis was on the patient's *reliance* on the medical facility:

[T]his court has held that the statutory requirement of "some use of tangible property" subjects governmental units to liability for personal injuries negligently caused by the non-use of tangible property. *Jenkins v. State,* 570 S.W.2d 175, 178 (Tex.Civ. App.—Houston [14th Dist.] 1978, no writ). However, *Jenkins,* like the majority of the cases cited by appellants, concerns situations in which the state institution clearly assumed a duty of care for the injured individual's well-being by either confining the individual in a state prison facility, thus preventing him from seeking alternative medical care, *Id.* at 176, or accepting and admitting the individual for medical treatment in a state hospital. In *Rodriguez* and *Garcia,* failure to provide life-sustaining equipment such as oxygen, *Rodriguez v. Holmes,* 556 S.W.2d 125, 126 (Tex.Civ. App.—San Antonio 1977, no writ), or a pediatric endo-tracheal tube, *Garcia v. Memorial Hosp.,* 557 S.W.2d 859, 859 (Tex. Civ.App.—San Antonio 1977, no writ), supported state liability; however, the individuals in those cases entered and were admitted to state facilities for the purpose of being treated with those or other similar life-sustaining equipment. That is not the situation in the instant case. Here there was no such reliance by appellants or Mrs. Weeks. Mrs. Weeks left the hospital of her own volition. Additionally, appellants' pleadings reflect only that Mrs. Weeks was "placed in" Ben Taub Hospital. There is no indication in the record that Mrs. Weeks was officially admitted as a patient in the Ben Taub facility; furthermore, the record suggests that appellants had no intention of admitting the deceased into the state facility but made arrangements to transfer her to another near-by hospital.

*Id.* at 171 (Citations omitted.).

YK contends that it, like Ben Taub Hospital, did not admit Mrs. Wheeler and therefore cannot be held to have waived immunity under section 101.021(2) for the nonuse of property. We do not agree. The *Weeks* court found that Mrs. Weeks had not relied on Ben Taub in any way. However, unlike Mrs. Weeks, Mrs. Wheeler was required to rely on YK and its personnel for a determination of her ability to make the more than 90–mile trip to Galveston. The record reflects that once Mrs. Wheeler arrived at Yettie Kersting, the hospital could not transfer her to John Sealy without authorization for the transfer from Dr. Rodriguez, the doctor on "county cover" that day. In order to obtain authorization, the hospital was required to communicate to the doctor the status of Mrs. Wheeler's labor and other relevant medical information. Mrs. Wheeler thus was *forced* to rely on YK in two particulars: (1) to accurately assess her status and the status of her baby and (2) to accurately communicate that information to Dr. Rodriguez and the John Sealy doctor.

Furthermore, while the record in *Weeks* indicated that the Weeks family had no intention of admitting Mrs. Weeks to Ben Taub, the opposite is true in the Wheelers' case. Had Nurses Colvin and Davison accurately assessed the status of Mrs. Wheeler's labor and the breech position of the baby, it is highly likely that Mrs. Wheeler would have been admitted to Yettie Kersting for delivery.

Accordingly, we hold that the Wheelers stated a cause of action against UTMB and Yettie Kersting that falls within the waiver of immunity provided by section 101.021(2) of the Tort Claims Act.

### Official Immunity (Nurses)

The nurses assert official immunity as a basis for summary judgment in their favor, contending that immunity is granted so long as their position is quasi-judicial and they acted in good faith. The Wheelers respond that in order to claim quasi-judicial status, medical personnel must show that their duties are uniquely different from the duties of comparable personnel engaged in the private sector. *Armendarez v. Tarrant County Hosp. Dist.,* 781 S.W.2d 301, 303 (Tex.App.—Fort Worth 1989, writ denied).

■ The doctrine of official immunity confers immunity on certain public officials to allow them to perform their governmental duties fearlessly and vigorously without fear of damage suits for acts done in the course of those duties. *Doe v. McMillan*, 412 U.S. 306, 318–19, 93 S.Ct. 2018, 2027–28, 36 L.Ed.2d 912 (1973); *see also Barr v. Matteo*, 360 U.S. 564, 571–73, 79 S.Ct. 1335, 1339–40, 3 L.Ed.2d 1434 (1959); *Gleason v. Beesinger*, 708 F.Supp. 157, 159 (S.D.Tex.1989); *Armendarez*, 781 S.W.2d at 305. In order to establish entitlement to the protection of official immunity, a government employee such as Nurse Colvin or Davison must show the following:

(1) she occupies a position of quasi-judicial status;

(2) she acted in good faith; and

(3) she acted within her authority as a quasi-judicial employee.

*Armendarez v. Tarrant County Dist.*, 781 S.W.2d at 305; *see also Armendarez*, 781 S.W.2d at 308 (Meyers, J., dissenting); *Baker v. Story*, 621 S.W.2d 639, 644 (Tex.Civ. App.—San Antonio 1981, writ ref'd n.r.e.).

■ Recognizing that almost any act might be said to involve some discretion in the manner of its performance, Texas courts have adopted a governmental/occupational test to determine whether a government employee occupies a position of quasi-judicial status. *Armendarez*, 781 S.W.2d at 305; *Christilles v. Southwest Texas State Univ.*, 639 S.W.2d 38, 42–43 (Tex.App.—Austin 1982, writ ref'd n.r.e.); *Baker*, 621 S.W.2d at 645. An employee is in a quasi-judicial position and, thus, entitled to immunity when

(1) she performs discretionary[20] duties uniquely different from an employee engaged in a similar practice in the private sector; or

(2) she exercises a function unique to the government.

*Armendarez*, 781 S.W.2d at 306. The rationale behind the doctrine of official immunity is served by this test because the public employee is protected when acting in a unique, official capacity. However, when the public employee's duties are the same as those of a corresponding employee in the private sector, the possibility of intimidation by the threat of a lawsuit is also the same. *Armendarez*, 781 S.W.2d at 309.[21] The rationale also serves the public policy that the mere fact of governmental employment, without more, should not automatically insulate one from any and all liability for his or her negligent acts.

With these principles in mind, we turn to the question of whether Nurses Colvin and Davison established as a matter of law that they were (1) performing discretionary duties uniquely different from nurses engaged in a similar practice in the private sector; or (2) exercising a function unique to the government. *See Armendarez*, 781 S.W.2d at 305. The nurses claim that they presented summary judgment evidence to establish these elements. However, a review of the record does not support that claim. The affidavit of Edward Pickett, Chairman of the Board of Yettie Kersting Hospital, establishes only that the nurses are governmental employees. The affidavit of Nurse Colvin does not address the factors required to prevail on their claim of official immunity. Thus, we conclude that the nurses did not establish as a matter of law that they met the threshold requirements for asserting official immunity, and summary judgment on that ground was improper. We sustain points of error five and six.

### Nursing Standard of Care
### (Point of Error 7)

The Wheelers include a point of error claiming that the nurses were not entitled to summary judgment because they failed to establish as a matter of law that they met the

---

20. Discretionary acts are those requiring personal deliberation, decision, and judgment. Employees are not immune from suit arising from their ministerial acts, i.e., acts that involve obedience of orders or performance of duties requiring non-governmental choices. *Gleason*, 708 F.Supp. at 159.

21. The opinion cites as examples of positions involving duties uniquely governmental the commissioners of a navigation district, directors of a flood control project, a district attorney, and law enforcement officers.

applicable standard of care. YK and the nurses did not argue this point in their motion for summary judgment or their appellate brief, although it is impliedly raised by Nurse Colvin's affidavit, which states that the nurses met the standard of care. We hold that summary judgment, if granted on this point, would have been improper because the relevant summary judgment evidence consisted of competing affidavits—by Nurse Colvin and Nurse Grantom—indicating the existence of fact issues. *See Gravis v. Physicians and Surgeons Hosp. of Alice,* 427 S.W.2d 310, 311–12 (Tex.1968); *Trapnell,* 809 S.W.2d at 610.

We sustain point of error seven.

## SUMMARY JUDGMENT FOR THE EMTs and LIFE SUPPORT SYSTEMS (Points of Error 8, 9, and 10)

### DTPA Issues (Point of Error 8)

The Wheelers contend that the trial court erred in granting summary judgment on their cause of action against the EMTs and Life Support Team (collectively "the EMTs") under the Texas Deceptive Trade Practices Act, because they demonstrated fact issues regarding the EMTs' alleged violations of TEX.BUS. & COM.CODE ANN. § 17.46(b)(5), (7), and (23),[22] (Vernon 1987 and Supp.1993), and unconscionable acts under TEX.BUS. & COM. CODE ANN. § 17.50(a)(3).[23] *See Mueller v. Allied Addicks Bank,* 787 S.W.2d 447, 450 (Tex.App.—Amarillo 1990, writ denied) (contradictory summary judgment evidence was sufficient to raise a fact issue regarding whether deceptive act occurred and whether it constituted a misrepresentation).

Specifically, the Wheelers' pleadings alleged representations by the EMTs regard-

ing their evaluation of the stability of Mrs. Wheeler's condition and the safety and prudence of transporting her to Galveston. The EMTs argue that they made no such representations. They also contend that they made no other representations about their services and that the statement that Life Support Services was a "comprehensive ambulance service" is not a misrepresentation of the quality and benefit of the services they offered. Instead, they argue, Life Support Team met and exceeded the requirements of its contract with Liberty County.

■ Whether the representations were made is a question of fact. *See Spradling v. Williams,* 566 S.W.2d 561, 563 (Tex.1978) (whether deceptive act or practice occurred is a fact to be found by a jury); *see also Mueller,* 787 S.W.2d at 450 (contradictory summary judgment evidence was sufficient to raise a fact issue regarding whether deceptive act occurred and whether it constituted a misrepresentation). Performance or breach of the EMTs' contract with the county, if relevant in the context of the Wheelers' suit, is also a fact question. Further, the Wheelers correctly argue that no specific representations need be required in order to maintain a DTPA suit for unconscionable conduct.[24] *Chastain v. Koonce,* 700 S.W.2d 579, 582 (Tex.1985); *Teague v. Bandy,* 793 S.W.2d 50, 54 (Tex.App.—Austin 1990, writ denied).

■ Finally, the EMTs contend that the Wheelers cannot recover under the DTPA because they suffered no recoverable damages. Specifically, they argue that there can be no "gross disparity in the value received and the consideration paid," TEX.BUS. & COM. CODE ANN. § 17.45(5), because the Wheelers,

---

**22.** These subsections cover misrepresentations of the characteristics, uses, benefits, standard, quality and grade of the EMTs services and the EMTs failure to disclose information concerning the services which were known at the time of the transaction, if such failure was intended to induce the plaintiffs into the transaction which plaintiffs would not have entered if the information had been disclosed.

**23.** In their brief, the Wheelers state that another ground urged by the EMTs in their motion for summary judgment was Mrs. Wheeler's lack of

consumer status. A review of the motion and the EMTs brief on appeal, however, indicates that the EMTs did not challenge Mrs. Wheeler's consumer status. Therefore, we need not address this point.

**24.** In stating a fact issue on unconscionability, the Wheelers rely in part on the EMTs' testimony that they had been trained in handling breech delivery, they knew the urgency of establishing an airway for the infant and had been trained in providing one, but, in this most critical situation, all they did was "think about it."

as indigents, paid no consideration for the use of the EMTs' services. The only other damages suffered by the Wheelers were alleged to be unrecoverable wrongful death damages. Thus, the EMTs reason, no actual damages exist.

An unconscionable action or course of action is defined by statute to include an act which:

A. Takes advantage of the lack of knowledge, ability, or capacity of a person to a grossly unfair degree; or

B. Results in a gross disparity between the value received and the consideration paid in a transaction involving the transfer of consideration.

*See Chastain,* 700 S.W.2d at 582; Tex.Bus. & Com.Code Ann. § 17.45(5) (Vernon 1987). The Wheelers plead facts which pertain to the first part of this disjunctive definition. Therefore, the absence of consideration paid is irrelevant. Further, our holding, that the Wheelers can recover damages arising from the negligent acts, if any, of the various appellees, resolves this issue in their favor and requires reversal of the summary judgment on the DTPA issues. Accordingly, we sustain point of error eight.

### The Good Samaritan Statute and the EMT Standard of Care (Points of Error 9 and 10)

■ The EMTs moved for summary judgment also on grounds that the "good samaritan statute," Tex.Civ.Prac. & Rem. Code Ann. § 74.002 (Vernon 1986), limits their civil liability for emergency care to acts that are willfully or wantonly negligent. The applicable section provides as follows:

§ 74.002. Unlicensed Medical Personnel

Persons not licensed in the healing arts who in good faith administer emergency care as emergency medical service personnel are not liable in civil damages for an act performed in administering the care unless the act is willfully or wantonly negligent. This section applies without regard to whether the care is provided for or in expectation of remuneration.[25]

In seeking summary judgment, the EMTs argued that their conduct was not negligent or grossly negligent and that their actions in the transportation and care of Mrs. Wheeler did not cause her any harm. They attached as proof the depositions of EMTs Koehler and Davis and the affidavit of David Gaines, certified EMT and paramedic. However, as the following review of the summary judgment evidence demonstrates, there are internal contradictions in the deposition testimony of the EMTs that raise fact issues regarding willful or wanton negligence, thus precluding summary judgment. In addition, the expert affidavit offered by the EMTs is deficient for two reasons: (1) it fails to address a significant issue raised by the Wheelers in their response to the motion, by failing to address whether the performance of the amniotomy was gross negligence, and (2) it appears to contradict the testimony of the EMTs themselves by stating, "Attempts were made to clear an airway without success."

Specifically, the following proof is sufficient to raise fact issues regarding the EMTs' violation of the applicable standard of care under section 74.002 and their liability:[26]

The deposition of EMT Koehler who stated that (1) he believed Wheeler would deliver en route based on the increasing intensity and shorter spacing of her contractions; (2) he had the authority to refuse to transport her to John Sealy but did

---

25. "Heedless and reckless disregard," sometimes termed "willful act or omission" or "willful and wanton disregard," means "that entire want of care which would raise the belief that the act or omission complained of was the result of a conscious indifference to the right or welfare of the person or persons to be affected by it." *See Burk Royalty Co. v. Walls,* 616 S.W.2d 911, 916–20 (Tex.1981). It is synonymous with "gross negligence." *Id.* at 920.

26. The specific duties alleged to have been breached by the EMTs were (1) duty to provide airway during breech delivery, (2) duty to monitor labor and status of contractions, (3) duty to request assistance from closest hospital, (4) duty not to exceed their level of training by performing the amniotomy, a medical procedure; (5) duty to respond to the vaginal constriction around the infant's head and neck by performing appropriate maneuvers to deliver the head.

so anyway;[27] (3) he knew how to maintain an airway for the baby but chose not to do so for fear of causing the mother to tear and bleed to death; (4) the EMTs had a limited amount of training in breech births; (5) there were other hospitals along their route to Galveston but they did not consider taking the patient to any of them.

The deposition of EMT Davis who stated (1) he was taught how to maintain an airway for the baby in a breech birth; (2) he was supposed to perform the procedure if he had a question about whether the baby was getting air; (3) he would consider the situation with Mrs. Wheeler a time when the maneuver was appropriate; (4) he realized that failure to perform the maneuver would result in the baby's oxygen deprivation and death; (5) he and Koehler discussed performing the procedure but he made no attempt to do so. The deposition of Dr. Rodriguez who stated that (1) the action of EMT Davis in tearing the amniotic sac open was "completely wrong" and speeded up the delivery; (2) the proper procedure when the water breaks is to have the patient lie quietly and avoid rupturing the membranes; (3) in reasonable medical probability, had the EMTs followed the proper procedure, there would have been time for Life Flight to arrive and take Mrs. Wheeler to John Sealy; (4) as Mrs. Wheeler's labor became more intense, the EMTs should have stopped at one of the several other hospitals en route to have Mrs. Wheeler rechecked.

The affidavit of Laura Kitzmiller, EMT expert, who stated that the failure of the EMTs to attempt to maintain an airway for the infant was beneath the standard of care for EMTs.

The affidavit of Michael Finan, M.D. who stated that the EMTs' failure to attempt to establish an airway for the baby or deliver its head was beneath the standard of care for an EMT.

In order to obtain summary judgment, the EMTs were required to establish, as a matter of law, that they were not willfully or wantonly negligent in caring for Mrs. Wheeler. The summary judgment proof raises fact issues on this point that preclude summary judgment. Accordingly, we sustain points of error nine and ten.

## SUMMARY JUDGMENT ON LOSS OF CONSORTIUM (Point of Error 11)

The trial court granted summary judgment in favor of all defendants on grounds that Roger Wheeler had no cause of action for loss of consortium because his wife had no viable negligence claim. *Whittlesey v. Miller*, 572 S.W.2d 665, 666 (Tex.1978). Our reversal of the summary judgments on Mrs. Wheeler's causes of action necessitates reinstatement of the derivative claim brought by Mr. Wheeler as well. We sustain the Wheelers' eleventh point of error.

## SUMMARY JUDGMENT ON BAD FAITH (Point of Error 12)

In stating a cause of action for breach of the duty of good faith and fair dealing, the Wheelers alleged that they engaged the services of all the appellees with the belief that the appellees were capable of providing the necessary emergency medical services. The appellees failed to exercise that degree of care and diligence which professionals of ordinary care and prudence would have exercised in the management and care of a woman in active labor. Because they knew or should have known that transfer was not proper or prudent, the appellees were required by the duty of good faith and fair dealing to administer the proper treatment rather than transfer Mrs. Wheeler. They breached this duty by transferring her. No special exceptions were filed to these pleadings.

Texas recognizes a common law duty of good faith and fair dealing. *Arnold v. National County Mut. Fire Ins. Co.*, 725 S.W.2d 165, 167 (Tex.1987). The appellees contend, however, that this duty is not applicable in

---

**27.** At another point in his deposition, contradicting this statement, Koehler said he did not have the authority to refuse.

the context of a claim against a health care provider. We agree.

The duty of good faith may arise as a result of a special relationship[28] between the parties governed or created by contract. *Arnold,* 725 S.W.2d at 167 (citing *Manges v. Guerra,* 673 S.W.2d 180, 183 (Tex.1984)); *see English v. Fischer,* 660 S.W.2d 521, 524 (Tex. 1983) (Spears, J. concurring). The relationship is akin to the relationship of special trust and confidence in a fiduciary relationship and is to be imposed only in certain narrowly limited circumstances.

Although often urged to do so, the supreme court has hesitated to extend the duty of good faith and fair dealing to other contexts beyond the special relationship between an insurance company and its insured. *See Winograd v. Willis,* 789 S.W.2d 307, 312 (Tex.App.—Houston [14th Dist.] 1990, writ denied) (no such duty in employer-employee relationship); *Winters v. Houston Chronicle Pub. Co.,* 795 S.W.2d 723, 724 n. 2 (Tex.1990) (employment-at-will context); *FDIC v. Coleman,* 795 S.W.2d 706, 708–709 (Tex.1990) (creditor-guarantor, and mortgagor-mortgagee contexts); *Herndon v. First Nat'l Bank of Tulia,* 802 S.W.2d 396, 399 (Tex.App.—Amarillo 1991, writ denied) (bank-borrower); *Adolph Coors Co. v. Rodriguez,* 780 S.W.2d 477, 481 (Tex.App.—Corpus Christi 1989, writ denied) (supplier-distributor); *Caserotti v. State Farm Ins. Co.,* 791 S.W.2d 561, 566 (Tex.App.—Dallas 1990, writ denied) (insurance company and third party claimant). The Wheelers cite no case where a duty of good faith and fair dealing was imposed in a medical negligence context.

Significantly, the supreme court has recently refused to impose a duty of good faith and fair dealing where a statutory scheme controlling the relationship is already in existence. *Crim Truck & Tractor Co. v. Navistar Int'l Transp. Corp.,* 823 S.W.2d 591, 595 (Tex.1992) (where DTPA provided cause of action for breach of a franchise agreement, no common law fiduciary duty would be imposed). In declining to impose a common-law fiduciary duty on the parties to the franchise agreement, the supreme court said,

> [W]e find imposition of a common law duty unnecessary under the current statutory scheme controlling this aspect of the franchise relationship.... The legislature has undertaken to regulate many aspects of the relationship at issue here. [citation of statutes omitted] ... A person who has sustained damages as a result of a violation of these provisions may bring suit under the [DTPA]. We see no good reason to add to the existing regulatory scheme by implication of a common law fiduciary duty.

*Navistar,* 823 S.W.2d at 595–96. We find this reasoning persuasive in the instant case. A claim for breach of the duty of good faith and fair dealing arises in tort. *See Arnold,* 725 S.W.2d at 168. The facts and damages alleged in the Wheelers' cause of action for the breach of this duty are the same as those factual allegations stated in their health care liability claims and, in the case of the EMTs, their negligence and DTPA claims.

The duties owed to Mrs. Wheeler are governed by the appropriate standards of care that apply to each of the appellees. Imposition of a duty of good faith and fair dealing in the context of the Wheelers' claim would not only create the basis for a double recovery but also would appreciably alter the standard of liability of the health care providers. In the absence of supreme court authority recognizing the duty of good faith and fair dealing in this context, we decline to impose one. We overrule point of error 12.

## SUMMARY JUDGMENT ON MISREPRESENTATION
### (Point of Error 13)

Relying on the case of *Caldwell v. Overton,* 554 S.W.2d 832, 833 (Tex.App.—Texarkana 1977, no writ), the Wheelers pleaded a cause of action for misrepresentation against all the appellees. In seeking summary judgment on this cause of action, Dr. Rodriguez's only defenses were (1) his contention that no doctor-patient relationship

---

**28.** The relationship has been characterized as marked by a shared trust or an imbalance in bargaining power. *Aranda v. Ins. Co. of N. Am.,* 748 S.W.2d 210, 212 (Tex.1988); *Arnold,* 725 S.W.2d at 167.

was established, and (2) his insistence that it is "beyond argument" that he made no misrepresentation to Mrs. Wheeler, having never seen or talked to her directly. The YK appellees also contend that they made no oral representations to Mrs. Wheeler and that they are protected from such a claim by governmental immunity.[29] We have held that a doctor-patient relationship was established and that immunity was waived under the Tort Claims Act. Further, as we have previously noted, whether misrepresentations are made is a question of fact. *Spradling*, 566 S.W.2d at 563.

In *Caldwell*, Doctor Overton was consulted to prepare a report regarding the extent and permanence of a worker's compensation plaintiff's claimed injuries, but he was not a treating physician. After relying on incomplete test results, the doctor supplied copies of his report, stating that Caldwell had no real injury or residual injury, to her treating physician, the IAB, her employer's insurance carrier, and her attorney. *Id.* at 833. In reliance on the report, Caldwell allegedly agreed to a settlement of her compensation claim for much less than the claim's true value. Then, in a second report, the doctor stated that further test results revealed an injury that might require surgery. *Id.*

When Caldwell failed to present expert testimony of the standard of care for a doctor providing a service such as that provided by Overton, the trial court granted Overton's motion for a directed verdict. On appeal, Dr. Overton conceded that "negligent misrepresentation" may constitute a cause of action, but he insisted that Caldwell had failed to prove her case. The court agreed, holding that in order to establish a physician's negligence in making representations about his or her patient, the plaintiff must establish, by expert testimony, the standard of care and a violation of that standard *just as in any medical malpractice case:*

> The representation in question was a physician's conclusion about the medical condition of a patient and the conclusion could only have been negligently reached by the

physician's failure to perform his duty of reasonable care, skill and diligence. It seems obvious and beyond argument that a conclusion induced by negligence must exist before it may be communicated to another as a negligent representation....

> When a patient in doubt about his health and bodily condition requests and is supplied medical information, such as a diagnosis or a prognosis, the patient is entitled to expect the medical practitioner to exercise the care and competence in reaching an opinion that the practitioner's profession requires and which the practitioner professes to have by engaging in medical practice.

554 S.W.2d at 834. Under the analysis in *Caldwell*, there is no distinction between the cause of action for medical negligence asserted by the Wheelers and their cause of action for negligent misrepresentation made to them. They are entitled to plead their case under as many theories as apply to the facts and circumstances. Tex.R.Civ.P. 47. Thus, having found that the Wheelers have stated a valid cause of action for medical negligence, we must sustain point of error 13 and reverse the summary judgment on negligent misrepresentation.

The Wheelers also state that a fact issue exists regarding whether the birth en route occurred because the Nurses and Dr. Rodriguez negligently represented to the EMTs that Mrs. Wheeler could be safely transported to Galveston. A claim of negligent misrepresentation made by medical personnel to a third party about the plaintiff's condition, if properly pleaded, fits into the factual scenario of *Caldwell* as well.

## SUMMARY JUDGMENT ON INVASION OF PRIVACY (Point of Error 14)

■ The Wheelers pleaded that Mrs. Wheeler suffered mental anguish, embarrassment, and humiliation when she was forced to share an ambulance with a stranger, under circumstances that were recognized as questionable; she was forced to give birth in a parking lot, where an unidentified indi-

29. UTMB and John Sealy do not address this cause of action. The EMTs' contentions have been addressed elsewhere in this opinion.

vidual entered the ambulance and attempted to offer assistance; and she suffered the public agony of her child dying during his birth in front of the ambulance companion and "whomever might have wandered up to the post office parking lot." Because of these events, Mrs. Wheeler suffered "intrusion upon her seclusion, solitude, or private affairs."

YK and the Nurses offered no summary judgment evidence to negate this cause of action other than their general assertion of governmental immunity which we have overruled. Thus, the summary judgment in favor of those appellees on this cause of action cannot stand. TEX.R.CIV.P. 166a(c).

The EMTs agree that the invasion of privacy claim is viable but assert as a defense the fact that there must be an *intentional* intrusion, such as a physical invasion of property or by eavesdropping, *Gill v. Snow*, 644 S.W.2d 222, 224 (Tex.App.—Fort Worth 1982, no writ). They state that the Wheelers' pleadings against them, which involve only negligence claims, will not support an invasion of privacy cause of action. The Wheelers respond that their allegations are broad enough to encompass either intentional or negligent conduct. Further, intent is a fact question for a jury to resolve. *Spoljaric v. Percival Tours, Inc.*, 708 S.W.2d 432, 436 (Tex.1986).

Likewise, UTMB and John Sealy complain that the Wheelers' pleading was "unclear" regarding whether they assert a negligent or intentional invasion. These appellees also assert that the Wheelers failed to plead causation against them. These complaints, like those of the EMTs, should have been raised by special exceptions, not summary judgment. Because no special exceptions were filed and the Wheelers were not given opportunity to amend, we must liberally construe their pleadings. Doing so, we find that they have stated a cause of action for negligent and intentional invasion of privacy.

The appellees rely on the court of appeals' opinion in *Boyles v. Kerr*, 806 S.W.2d 255 (Tex.App.—Texarkana 1991), *rev'd*, 855 S.W.2d 593 (Tex.1993), and the fact that writ was granted on the negligent invasion of privacy point, 806 S.W.2d 255, for their contention that the law regarding the tort of negligent invasion of privacy is unsettled. However, after the briefs had been filed in this case, the supreme court noted in reversing *Boyles* that:

> Kerr's counsel abandoned her action[ ] for ... negligent invasion of privacy.... Kerr [ ] unequivocally waived all theories other than negligent infliction of emotional distress[.]

855 S.W.2d at 601. As a result, the supreme court did not reach the issue of whether a cause of action exists for negligent invasion of privacy. Thus, the question remains open. We sustain point of error 14.

### SUMMARY JUDGMENT FOR UTMB AND JOHN SEALY ON STANDARD OF CARE (Point of Error 15)

In addition to the sovereign immunity defense raised by John Sealy and UTMB (see points of error five and six), those entities also moved for summary judgment on grounds that, as a matter of law, they did not violate the standard of care. The Wheelers contend that the summary judgment proof provided by these appellees was legally insufficient to support the judgment. We agree.

In support of their motion, UTMB and John Sealy attached only a copy of chapter 11 of the Hospital Licensing Standards, which sets forth the rules governing patient transfers. However, the rules were not in effect at the time of the transfer and those rules that were in effect were silent on the question of transfers of patients from one hospital to another. In addition, even had the rules been applicable, the appellees attached no summary judgment evidence of their compliance with them. Thus, there was absolutely no summary judgment evidence establishing the standard of care or the absence of a breach.

UTMB and John Sealy also argue on appeal that even if there was a breach of some duty that falls within the waiver provision of the Tort Claims Act, the Wheelers "provided no evidence that any action or inaction by UTMB was the proximate cause of Mrs. Wheeler's injuries." In other words, UTMB claims the Wheelers "have not creat-

ed a causal link" between the use of tangible property and Mrs. Wheeler's injuries.

This complaint ignores the standard of review for summary judgments. In the trial court, the nonmovant has no burden to provide evidence of negligence or proximate cause. When, as here, the defendant moves for summary judgment, he has the burden to establish by competent summary judgment proof that no material issue of fact exists on one or more essential elements of the cause of action pleaded by the plaintiff. *Mitchell v. Shepperd Memorial Hosp.*, 797 S.W.2d 144, 147 (Tex.App.—Austin 1990, writ denied); *see also Wheeler v. Aldama–Luebbert*, 707 S.W.2d at 216–17. *When the movant's proof is sufficient,* the nonmovant must then present evidence sufficient to raise a fact issue on each point established by the movant. *Id.* at 147 (emphasis added). UTMB and John Sealy failed to meet their burden to present sufficient evidence to negate the element of proximate cause. Because UTMB and John Sealy provided no evidence to support it, the summary judgment in their favor must be reversed. We sustain point of error 15.

We sustain the summary judgments granted in favor of all appellees on the Wheelers' cause of action for breach of the duty of good faith and fair dealing. We reverse all of the remaining summary judgments and remand this case to the trial court.