COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS

|  |  |  |
|---|---|---|
|  | § |  |
| HELEN ESTRADA, INDIVIDUALLY AND ON BEHALF OF ALL WRONGFUL DEATH BENEFICIARIES AND AS REPRESENTATIVE OF THE ESTATE OF RICHARD ESTRADA, DECEASED, | § | No. 08-10-00290-CV |
|  | § | Appeal from |
|  | § | 346th District Court |
| Appellant, | § | of El Paso County, Texas |
| v. | § | (TC #2010-3305) |
| ENCARNACION MIJARES, N.P. AND JEANETTE TAN, M.D., | § |  |
| Appellees. | § |  |

### O P I N I O N

This appeal arises from a medical malpractice suit against a nurse practitioner, Encarnacion Mijares, and her employer, Jeanette Tan, M.D., on a theory of vicarious liability. The trial court granted summary judgment in favor of Mijares on the ground that she did not have a nurse-patient relationship with Richard Estrada. For the reasons that follow, we affirm.

### FACTUAL SUMMARY

On July 21, 2007, Richard Estrada was admitted to Del Sol Medical Center by his primary physician, James Gibson, M.D. due to complaints of a cough and shortness of breath. The following day, Dr. Gibson requested a pulmonary evaluation from the on-call pulmonologist. Ahmad M. Hajj, M.D was covering for Dr. Tan, meaning that he was seeing all of Dr. Tan's ICU patients at Del Sol in addition to the new consults.

Encarnacion Mijares is a nurse practitioner. The summary judgment evidence related to Mijares' motion for summary judgment shows that Mijares worked for Dr. Tan as a nurse

practitioner in 2007 and did not work for Dr. Hajj.[1] On July 22, 2007, Mijares was at the hospital seeing some of Dr. Tan's existing patients when one of the nurses told her about the consult for Dr. Tan. Mijares told the nurse that Dr. Tan was not taking calls and Dr. Hajj was on-call. The nurse subsequently told Mijares that a call had been made to Dr. Hajj's answering service. Mijares telephoned Dr. Hajj "out of courtesy" to let him know about the pulmonary consult. Mijares relayed to Dr. Hajj the information in Estrada's chart, including the lab results and the results of the CT scan of the lungs. Mijares then transcribed Dr. Hajj's verbal orders onto Estrada's chart. The record does not include a copy of the order itself but Mijares stated during her deposition that Dr. Hajj ordered Rocephin, one gram IV piggyback every 24 hours; "Neb" treatments with Xopenex, 0.63, and Atrovent unit dose via E-Z pack four times a day, as needed, and sputum for gram stain and CNS. He also ordered the hospital to document the O2 saturation in the progress notes. Both Mijares and Dr. Hajj signed the orders. Mijares explained in her deposition that she could not write orders at the hospital and hospital policy required that the consulting doctor "countersign" the verbal orders. Dr. Hajj never asked Mijares to evaluate Estrada.

Dr. Gibson discharged Estrada from the hospital on July 23, 2007. The following nursing note is found in Estrada's chart for July 23, 2007: "M.D. Gibson has seen PT down in x-ray. He has given the OK to DC PT home today. [Mijares] has been notified. She has spoken with M.D. Hajj. He has given the OK to DC PT." Mijares specifically denied having any conversation

---

[1] Appellant's claims against Dr. Tan are based on a theory of vicarious liability. Dr. Tan filed a motion for summary judgment in which she denied being Mijares' employer or supervising physician. The trial court did not rule on Dr. Tan's motion for summary judgment and the court instead concluded that the summary judgment in favor of Mijares rendered moot all of Estrada's claims against Dr. Tan. Evidence that may be considered in determining a summary judgment motion includes deposition transcripts, interrogatory answers, and other discovery responses referenced or set forth in the motion or response as well as affidavits on file at the time of the hearing. Tex.R.Civ.P. 166a(c). The summary judgment order does not indicate that the trial court, in addressing Mijares' motion for summary judgment, considered any of the evidence attached to Dr. Tan's motion for summary judgment or to Appellant's response to that motion. Consequently, we will not consider that evidence in reviewing the trial court's ruling.

with the nurse or Dr. Hajj regarding the discharge of Estrada, explaining that she would not have given the order because Estrada was not her patient.  Dr. Hajj recalled speaking to the nurse at the hospital about the discharge but he did not recall speaking to Mijares.

Estrada followed up with Dr. Gibson following his discharge, but he had a heart attack on September 2, 2007 and died.  Helen Estrada, individually and on behalf of the wrongful death beneficiaries, and as the representative of the estate of her husband, filed suit against Dr. Gibson, Dr. Hajj, Dr. Tan, and Mijares, alleging that the defendants knew or should have known that Estrada was at risk of coronary heart disease and were negligent in failing to properly diagnose and treat him for heart disease.  Mijares filed a motion for summary judgment on the sole ground that she did not have a nurse-patient relationship with Estrada.  The trial court granted the motion and severed the claims against Mijares and Dr. Tan from the remaining claims.

## NURSE-PATIENT RELATIONSHIP

In her sole issue on appeal, Appellant contends that the trial court erred by granting summary judgment because Mijares failed to conclusively prove that she did not have a nurse-patient relationship with Estrada.  Alternatively, Appellant argues that a fact issue precludes the granting of summary judgment.

### *Standard of Review*

The standard of review for traditional summary judgment under TEX.R.CIV.P. 166a(c) is well established.  *Nixon v. Mr. Property Management Company, Inc.*, 690 S.W.2d 546, 548 (Tex. 1985).  The moving party carries the burden of showing there is no genuine issue of material fact and it is entitled to judgment as a matter of law.  *Diversicare General Partner, Inc. v. Rubio*, 185 S.W.3d 842, 846 (Tex. 2005); *Browning v. Prostok*, 165 S.W.3d 336, 344 (Tex. 2005).  Evidence favorable to the non-movant will be taken as true in deciding whether there is a disputed issue of

material fact. *Fort Worth Osteopathic Hospital, Inc. v. Reese*, 148 S.W.3d 94, 99 (Tex. 2004); *Tranter v. Duemling*, 129 S.W.3d 257, 260 (Tex.App.--El Paso 2004, no pet.). All reasonable inferences, including any doubts, must be resolved in favor of the non-movant. *Fort Worth Osteopathic Hospital*, 148 S.W.3d at 99. A defendant is entitled to summary judgment if the evidence disproves as a matter of law at least one element of each of the plaintiff's causes of action or if it conclusively establishes all elements of an affirmative defense. *D. Houston, Inc. v. Love*, 92 S.W.3d 450, 454 (Tex. 2002); *Randall's Food Markets, Inc. v. Johnson*, 891 S.W.2d 640, 644 (Tex. 1995). Once the defendant establishes a right to summary judgment as a matter of law, the burden shifts to the plaintiff to present evidence raising a genuine issue of material fact. *City of Houston v. Clear Creek Basin Authority*, 589 S.W.2d 671, 678-79 (Tex. 1979); *Scown v. Neie*, 225 S.W.3d 303, 307 (Tex.App.--El Paso 2006, pet. denied). We review the grant or denial of a traditional motion for summary judgment *de novo*. *Valence Operating Company v. Dorsett*, 164 S.W.3d 656, 661 (Tex. 2005); *Texas Integrated Conveyor Systems, Inc. v. Innovative Conveyor Concepts, Inc.*, 300 S.W.3d 348, 365 (Tex.App.--Dallas 2009, pet. denied).

### Existence of a Duty

In a medical malpractice claim, the plaintiff must prove four elements: (1) a duty by the physician/nurse/hospital to act according to applicable standards of care; (2) a breach of the applicable standard of care; (3) an injury; and (4) a causal connection between the breach of care and the injury. *Morrell v. Finke*, 184 S.W.3d 257, 271 (Tex.App.--Fort Worth 2005, pet. denied); *Cruz v. Paso Del Norte Health Foundation*, 44 S.W.3d 622, 629-30 (Tex.App.--El Paso 2001, pet. denied). The existence of a duty is a threshold question of law which must be decided

before the issue of standard of care arises. *Lection v. Dyll*, 65 S.W.3d 696, 704 (Tex.App.--Dallas 2001, pet. denied), *citing St. John v. Pope*, 901 S.W.2d 420, 424 (Tex. 1995).

In *St. John v Pope*, the Supreme Court explained that medical malpractice developed as a theory of liability discrete from common-law negligence and is imbued with both contract and tort principles. *St. John*, 901 S.W.2d at 423. Medical malpractice also differs from ordinary negligence in the circumstances under which a duty arises. *St. John*, 901 S.W.2d at 423. In an ordinary negligence case, the duty to refrain from negligently injuring others requires no prior relationship. *Id.* Professionals, on other hand, do not owe a duty to exercise their particular talents, knowledge, and skill on behalf of every person they encounter. *Id.* "As is true of all callings, physicians are not obligated to practice their profession or render services to everyone who asks." *Id.* It is only with the physician's express or implied consent that the physician-patient relationship is created. *Id.* The court held in *St. John* that the duty to treat the patient with proper professional skill flows from the consensual relationship between the patient and physician, and only when that relationship exists can there be a breach of a duty resulting in medical malpractice. *Id.* Creation of the physician-patient relationship does not require the formalities of a contract. *Id.* at 424. The fact that a physician does not deal directly with a patient does not preclude the existence of a physician-patient relationship. *Id.* If there is no prior relationship between the physician and the patient, there must be some affirmative action on the part of the physician to treat the patient to create such a relationship. *Gross v. Burt*, 149 S.W.3d 213, 221 (Tex.App.--Fort Worth 2004, pet. denied); *Majzoub v. Appling*, 95 S.W.3d 432, 436 (Tex.App.--Houston [1st Dist.] 2002, pet. denied); *Lection*, 65 S.W.3d at 705.

Texas courts have recognized the existence of the nurse-patient relationship but have not written extensively about how it is created in the context of a medical malpractice claim. *See*

*Lunsford v. Board of Nurse Examiners for the State of Texas*, 648 S.W.2d 391, 395 (Tex.App.--Austin 1983, no writ); *Childs v. Greenville Hospital Authority*, 479 S.W.2d 399, 401-02 (Tex.Civ.App.--Texarkana 1972, writ ref'd n.r.e.). Citing *Lunsford*, Appellant suggests that Mijares' duty to act according to the applicable standards of care arises from the mere fact that she possesses a nursing license.

In *Lunsford*, a nurse appealed an order of the Board of Nurse Examiners finding she had violated a board rule which requires a registered nurse to evaluate the status of a patient and to institute appropriate nursing care to stabilize a patient's condition and prevent complications. *Lunsford*, 648 S.W.2d at 394. Lunsford was employed by the Willacy County Hospital in Raymondville. Donald Wayne Floyd was traveling to Houston with Frances Farrell when he began experiencing chest pain so Farrell took Floyd to the Willacy County Hospital for medical assistance. Farrell left Floyd in the waiting area and tried to find a doctor to attend to Floyd who was experiencing significant pain and pressure in his chest as well as pain and numbness in his left arm. Farrell found a physician and explained that Floyd was suffering from chest pains, but he instructed her to seek help from the nurse on duty because he was busy. When Farrell persisted, he told her that the hospital's only cardiac care equipment was in use on another patient. The physician then instructed Lunsford to send Floyd to Valley Baptist Hospital in Harlingen. Lunsford approached Floyd who was continuing to complain of chest pain. Lunsford questioned Floyd about what he had eaten and whether he had engaged in heavy exercise that day. Lunsford did not take Floyd's vital signs even though she suspected "cardiac involvement" and she instructed Farrell to drive Floyd twenty-four miles to Valley Baptist Hospital in Harlingen. Lunsford told Farrell to use the emergency flashers and to "speed." She also asked

Farrell if she knew C.P.R. since there was a chance that she might have to use it while in route to Harlingen. Floyd died less than five miles from the Willacy County Hospital.

The Board of Nurse Examiners suspended Lunsford's nursing license for one year based on its finding that her conduct had been "unprofessional and dishonorable conduct likely to injure the public." *Lunsford*, 648 S.W.2d at 393. The Board determined that Appellant had violated a board rule which requires a registered nurse to evaluate the status of a patient and to institute appropriate nursing care to stabilize a patient's condition and prevent complications by failing to assess Floyd's condition, inform the attending physician of the "life-death" nature of Floyd's instability, and take appropriate measures to stabilize Floyd's condition and prevent his demise. *Id.* at 394.

Lunsford argued on appeal that she had no legal duty to care for Floyd because he was not the patient of the hospital or the on-duty physician. *Lunsford*, 648 S.W.2d at 394. In making this argument, Lunsford relied on a hospital policy which required that Floyd be sent to Valley Baptist unless he had a physician on the staff of Willacy County Hospital or unless it was a "life-death" situation. Lunsford also claimed on appeal that taking Floyd's vital signs and informing the on-duty physician of her findings would have been futile since he had already ordered her to send Floyd to Valley Baptist. In rejecting these arguments, the Austin Court of Appeals held that Lunsford's duty is not derivative of the relationship between Floyd and the hospital or the on-duty physician. *Lunsford*, 648 S.W.2d at 394. Her duty instead arises from the privilege granted Lunsford by the state in licensing her as a nurse. *Id.* Consequently, her duty could not be relieved by a hospital policy or a physician's order. *Id.* The Court of Appeals concluded that a nurse in Lunsford's situation has a duty to evaluate the medical status of the ailing person

seeking his or her professional care, and to institute appropriate nursing care to stabilize a patient's condition and prevent further complications of physical and mental harm. *Id.* at 395.

*Lunsford* is distinguishable because we are concerned here with whether a nurse had a duty to act according to the applicable standard of care in a medical malpractice action. The Austin Court of Appeals was careful to note that the suit against Lunsford was not brought in contract or in tort by an individual who feels he or she has been wronged by Lunsford's action or inaction. *Lunsford*, 648 S.W.2d at 395. It instead was brought by the State for Lunsford's violation of her contractual duties to always act in a professional and honorable manner. *Id.* Even if *Lunsford* could be construed as holding that a nurse's duty to act according to the applicable standard of care arises from the mere fact that she has a nursing license, such a holding would be contrary to *St. John v. Pope* because it would impose a duty on nurses to practice their profession or render services to everyone who asks. We therefore decline to apply *Lunsford* to this case.

The first question to be decided is whether the summary judgment evidence conclusively shows that Mijares did not consent or agree, either expressly or impliedly, to accept Estrada as a patient. Mijares stated the following in paragraphs four through six of her affidavit:

> 4. I never evaluated or treated Richard Estrada. I never examined Mr. Estrada or gave orders for his treatment, either personally or through an intermediary. I never exercised any medical judgment with regard to Mr. Estrada's care. I was never instructed or assigned to evaluate or treat Mr. Estrada.

> 5. On July 22, 2007, when asked to do so by a floor nurse at Del Sol Medical Center I, as a courtesy, communicated to Dr. Hajj that a pulmonary consult had been requested for Mr. Estrada. Also on July 22, 2007, Dr. Hajj gave orders via a telephone call for Mr. Estrada. I transcribed these orders onto Mr. Estrada's chart per Dr. Hajj's request.

> 6. I did not participate in the decisions to treat or not treat, or to discharge Mr. Estrada, nor did I have any other involvement in Mr. Estrada's care or treatment.

Dr. Hajj also testified that he never asked Mijares to evaluate Estrada. This evidence is sufficient to conclusively prove that Mijares did not have a nurse-patient relationship with Estrada, and therefore, she did not owe a duty to act according to the applicable standards of care. The burden shifted to Appellant to present evidence raising a genuine issue of material fact.

Appellant asserts that a fact issue exists because Mijares telephoned Dr. Hajj to inform him of the consultation with Estrada but Mijares insisted that she made the call as a courtesy to the doctor. Mijares did not by merely advising Dr. Hajj that he has been requested to provide a pulmonary consultation, consent or agree to accept Estrada as her patient.

Appellant next claims that a fact issue exists because Mijares provided Dr. Hajj with information from Estrada's chart regarding his condition. Mijares did not evaluate Estrada or take it upon herself to review his chart. The evidence instead shows that Dr. Hajj requested that Dr. Mijares provide him with information from Estrada's chart. There is no evidence that Mijares' reviewed the chart with the purpose of diagnosing Estrada or providing him with treatment. *See St. John*, 901 S.W.2d at 424 (even though doctor listened to another doctor's description of a patient's symptoms and came to a conclusion about the basis of the patient's condition, he did so for the purpose of evaluating whether he should take the case, not as a diagnosis for a course of treatment).

Appellant also claims that a fact issue exists with respect to the nurse-patient relationship because Mijares wrote orders on Estrada's chart. The evidence showed that Mijares transcribed Dr. Hajj's verbal orders onto the chart and he countersigned the orders in accordance with hospital policy. She explained that she was not authorized to write orders in the hospital setting and she was simply transcribing the orders dictated to her by Dr. Hajj. Dr. Gibson, however, made the following statement in his discharge summary: "Apparently, [Estrada] was seen by

Dr. Hajj's, I suspect, PA, who simply added Rocephin and as there is nothing to find clinically, I think we will send this man home." There is no evidence that Dr. Gibson was necessarily referring to Mijares when he made this statement. While we are required to take the evidence in the light most favorable to the non-movant, the summary judgment standard does not require the Court to assume facts not shown in the record.

Finally, Appellant claims, without citing any of the summary judgment evidence, that Dr. Hajj relied on Mijares' skill, education, and training as a nurse and nurse practitioner. We have reviewed all of the summary judgment evidence, including the excerpts of Dr. Hajj's deposition testimony and we have found no evidence supporting this statement. Having found no fact issues precluding summary judgment, we overrule the sole issue presented on appeal and affirm the judgment of the trial court.

February 20, 2013 _____
ANN CRAWFORD McCLURE, Chief Justice

Before McClure, C.J., Rivera, and Antcliff, JJ.
Antcliff, J., not participating