COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS



| | | |
|---|---|---|
| ROBERT R. OCHOA, M.D., | § | No. 08-23-00079-CV |
| Appellant, | § | Appeal from the |
| v. | § | 346th Judicial District Court |
| ELVIRA AVILA as Permanent Guardian of the Person and as Estate of LETICIA AVILA, | § | of El Paso County, Texas |
| | § | (TC# 2017-DCV-4524) |
| Appellee. | | |

# O P I N I O N

In this permissive interlocutory appeal, Appellant Robert R. Ochoa, M.D. (Dr. Ochoa) challenges a trial court order denying his no-evidence summary judgment motion on the sole issue of whether he formed a physician–patient relationship with Appellee Leticia Avila (Ms. Avila). Because Ms. Avila raised a genuine issue of material fact as to the existence of a physician–patient relationship, we affirm the trial court's judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

At 10:44 p.m. on January 13, 2016, Leticia Avila went to the Las Palmas Medical Center emergency department (ED) complaining of multiple symptoms after having fallen that day. Physician Assistant Jose Rincon (PA Rincon) treated Ms. Avila. In the hospital, an x-ray was taken of Ms. Avila's right knee, and the resulting images came back normal. PA Rincon reported a

clinical impression of "knee pain and knee contusion," addressed the same, then discharged her on January 14, 2016, at 12:45 a.m.

Dr. Ochoa, an ED attending physician, was the only physician in the ED when Ms. Avila went to the hospital and was treated by PA Rincon. Approximately an hour after Ms. Avila left the ED, Dr. Ochoa reviewed PA Rincon's chart for Ms. Avila and cosigned PA Rincon's chart at the line labeled "supervising physician," with the notation "I agree with the assessment and care plan, and confirm the diagnosis(es)."[1] However, Dr. Ochoa indicated that PA Rincon did not ask for his assistance in Ms. Avila's case;[2] that he was never at Ms. Avila's bedside; that there is no evidence he reviewed Ms. Avila's x-ray; and that he was not registered as PA Rincon's designated supervising physician with the Texas Medical Board. Dr. Ochoa understood that his role at the ED with respect to PA Rincon was to cosign his charts and orders, as required by hospital policy, and to assist or consult only if called upon by PA Rincon to do so. The ED's Medical Director, Dr. Mustafa Al-Chalabi, was registered as PA Rincon's supervisory physician with the Texas Medical Board.

Dr. Ochoa testified that he did not sign any agreement with Las Palmas explaining his role relative to the PAs, but he was responsible only for reviewing PA Rincon's chart as opposed to reviewing the nursing records and remainder of Ms. Avila's medical records, which he did not do here. For cosigning purposes, when he was not consulted to treat the patient, all Dr. Ochoa depended on was what the PA wrote in the PA's chart for the patient. Dr. Ochoa stated that only when something in the PA's documentation raised a question or concern would he expand his

---

[1] At oral argument, Dr. Ochoa's counsel explained that this notation is "template language," as opposed to language Dr. Ochoa wrote in the chart himself.

[2] PA Rincon stated that he is able to discharge patients without having the attending physician review his medical chart, and that in general, about half the time, patients are discharged prior to an attending physician reviewing his medical charts.

review by either speaking to the PA or reviewing the nursing notes in a patient's records. Dr. Ochoa explained that it is the PA's responsibility to consult the doctor if a patient presents with acute stroke symptoms. Dr. Ochoa indicated that PA Rincon never consulted with him concerning his assessment of Ms. Avila or her treatment plan.

Nonetheless, on the "ED Standard Report," Dr. Ochoa was listed as "Ordering Provider" for Ms. Avila's x-ray, immobilizer application, and provision and demonstration of crutches in the ER (ordered on January 13, 2016, at 2306, 2338, and 2338, respectively). Dr. Ochoa explained that, based on his understanding, "every order is placed under [his] name," but that does not mean he is responsible for reviewing the orders or ensuring whether they are appropriate. Dr. Ochoa is also listed as the "Provider" for hydrocodone and ketorolac (ordered for Ms. Avila on January 13, 2016, at 2307). The medical records indicate Ms. Avila's x-ray was reviewed by "ED physician."

The day after her hospital visit, Ms. Avila suffered a stroke, which left her permanently incapacitated. Her guardian filed suit against Las Palmas Medical Center, PA Rincon, and Dr. Ochoa alleging healthcare liability claims. In her petition, Ms. Avila's guardian alleged Dr. Ochoa was "negligent in reviewing the physician assistant's chart and was negligent in evaluating the physician assistant's assessment, care plan, and diagnosis." Additionally, she alleged Dr. Ochoa was negligent in failing to recognize that Ms. Avila was discharged despite having "serious neurological symptoms which required immediate diagnosis and treatment." Finally, she alleged Dr. Ochoa was negligent in failing to immediately call her after she was discharged to advise her to return to the hospital for "immediate neurological workup, diagnosis, and treatment."

Dr. Ochoa moved for a no-evidence summary judgment. Ms. Avila's guardian filed a response, attaching as evidence medical records, deposition testimony of PA Rincon and Dr. Ochoa, and hospital policies and bylaws. The trial court denied Dr. Ochoa's no-evidence summary judgment motion on the issue of the lack of a physician–patient relationship. Dr. Ochoa moved for

3

reconsideration or, in the alternative, to permit an interlocutory appeal of the issue. The trial court granted permission to pursue an interlocutory appeal pursuant to TEX. CIV. PRAC. & REM. CODE ANN. § 51.014(d), finding that the question of whether there was a physician–patient relationship presents a "controlling question of law as to which there is a substantial ground for difference of opinion," and "an immediate appeal from [the court's] Order may materially advance the ultimate termination of the litigation." We granted the petition for permissive appeal.

## STANDARD OF REVIEW

A movant is entitled to summary judgment if, after adequate time for discovery, there is no evidence of one or more essential elements of a claim or defense on which the nonmovant would have the burden of proof at trial. *See* TEX. R. CIV. P. 166a(i). A no-evidence summary judgment is properly granted if the nonmovant fails to bring forth more than a scintilla of probative evidence to raise a genuine issue of material fact as to an essential element of the nonmovant's claim on which the nonmovant would have the burden of proof at trial. *See id.*; *Merrell Dow Pharmaceuticals, Inc. v. Havner*, 953 S.W.2d 706, 711 (Tex. 1997). If the evidence supporting a finding rises to a level that would enable reasonable, fair-minded persons to differ in their conclusions, then more than a scintilla of evidence exists. *Havner*, 953 S.W.2d at 711. Less than a scintilla of evidence exists when the evidence is "so weak as to do no more than create a mere surmise or suspicion" of a fact, and the legal effect is that there is no evidence. *Kindred v. Con/Chem, Inc.*, 650 S.W.2d 61, 63 (Tex. 1983). Reviewing courts consider the evidence in a light most favorable to the nonmovant. *King Ranch, Inc. v. Chapman*, 118 S.W.3d 742, 750 (Tex. 2003); *In re Estate of Swanson*, 130 S.W.3d 144, 146 (Tex. App.—El Paso 2003, no pet.).

Only when a physician–patient relationship exists does a physician owe a patient a duty, the breach of which may result in medical malpractice liability. *St. John v. Pope*, 901 S.W.2d 420, 423 (Tex. 1995). In other words, whether a physician–patient relationship exists is a threshold question of law courts must address before the issue of the standard of care arises in a medical malpractice claim.[3] *Estrada v. Mijares*, 407 S.W.3d 803, 806 (Tex. App.—El Paso 2013, no pet.).

As the Supreme Court of Texas has explained, the physician–patient relationship is a voluntary and consensual one: "[i]t is only with a physician's consent, whether express or implied, that the doctor–patient relationship comes into being." *St. John*, 901 S.W.2d at 423. It can arise in two different ways: (1) when the physician takes an affirmative step to treat the patient; or (2)when a physician is a party to a contract for the benefit of the patient. *Wax v. Johnson*, 42 S.W.3d 168, 172 (Tex. App.—Houston [1st Dist.] 2001, pet. denied).

### A. Physician-patient relationship created by affirmative conduct

Where no prior physician–patient relationship exists, the physician must take some affirmative step to treat the patient in order to establish that relationship. *Reynosa v. Huff*, 21 S.W.3d 510, 513 (Tex. App.—San Antonio 2000, no pet.). On the one hand, an affirmative step to treat a patient does not require that a physician deal directly with the patient. *St. John*, 901 S.W.2d at 424. But simply being on-call or present in the hospital while the patient is being seen will not impose on the physician a duty to the patient. *Id.*; *Reynosa*, 21 S.W.3d at 513. To establish the physician–patient relationship by taking affirmative steps, a physician's conduct must be for the purpose of rendering medical services. *St. John*, 901 S.W.2d at 424. For example, where a

---

[3] We do not address Ms. Avila's medical malpractice claim in this opinion, including any potential applicable standard of care, as the only limited question before us is whether, when viewing the evidence in a light most favorable to Ms. Avila, she has shown the existence of a genuine issue of material fact on the physician–patient relationship question.

physician evaluates a patient to determine whether the physician will take the patient's case, the evaluation does not constitute an affirmative step towards treating the patient and will not create the physician–patient relationship. *Id.* But where a physician evaluates information about the patient and makes a medical decision about how to proceed with the patient's care—even if the decision is that no care is necessary—a physician–patient relationship is formed. *Wheeler v. Yettie Kersting Mem'l Hosp.*, 866 S.W.2d 32, 39–40 (Tex. App.—Houston [1st Dist.] 1993, no writ) (holding that a physician–patient relationship was formed between an on-call doctor and pregnant patient when he evaluated her condition and made a medical decision that it was safe to have the patient transferred to a distant hospital for delivery of her child); *Lection*, 65 S.W.3d at 707 (holding that physician's decision that no further treatment was necessary amounted to a medical decision supporting existence of physician–patient relationship).

## B. Physician–patient relationship created by contract

The creation of the physician–patient relationship does not require the formalities of a contract. *Id.* A contract-in-fact is formed where the acts and conduct of the parties evince a mutual intention to contract. *Lection v. Dyll*, 65 S.W.3d 696, 704 (Tex. App.—Dallas 2001, pet. denied). Physicians may contract through a hospital or health-care plan in advance to create a physician–patient relationships with the hospital's patients, leaving contracting physicians no discretion to decline treatment. *See St. John*, 901 S.W.2d at 424; *see also Hand v. Tavera*, 864 S.W.2d 678–79 (Tex. App.—San Antonio 1993, no writ).

## ANALYSIS

### A. Relevance of the "supervising physician" designation

As a preliminary matter, we address Ms. Avila's argument that Dr. Ochoa's signature by the designation "supervising physician" is an independent reason for the existence of a physician–patient relationship. In response, Dr. Ochoa contends that although he signed the records at the

6

supervising physician line, he was not PA Rincon's legally established supervising physician. He argues "Texas law further defines and thus restricts who is a supervising physician and, thus, who is responsible for the physician assistant's conduct."

Citing *Reynosa v. Huff*, Dr. Ochoa argues "a claim of supervision coupled with a physician's presence" does not establish a physician–patient relationship. 21 S.W.3d 510, 513 (Tex. App.—San Antonio 2000, no pet.). In *Reynosa*, a pregnant woman whose baby was delivered by a resident sued Dr. Huff, among numerous doctors, for negligence, asserting the physicians on the medical staff had the duty "to ensure patients at the facility receive quality care." *Id* at 512–13. Dr. Huff's summary judgment was affirmed because his evidence conclusively showed that "the procedure at the [hospital] is for the back-up on-call physicians to be assigned to specific patients" and Dr. Huff was assigned to patients other than Ms. Reynosa. *Id* at 514. He never saw Ms. Reynosa, spoke to her, or gave any advice regarding her care. *Id.* at 513. Here, Dr. Ochoa similarly denies establishing a physician–patient relationship with Ms. Avila because he never saw or spoke to Ms. Avila, was not the supervising physician, and was never consulted about her case while she was in the ED.[4] In this case though, Ms. Avila claims a physician–patient relationship based on something other than a supervising physician status and Dr. Ochoa's presence in the ED. For that reason, we examine Dr. Ochoa's involvement in Ms. Avila's case below to assess whether Dr. Ochoa took affirmative steps to treat Ms. Avila.

---

[4] Our research has not revealed a Texas case that addresses whether general physician supervision creates a physician–patient relationship between the supervising physician and the patient. Some Texas courts have found that directors of medical and laboratory facilities can form physician–patient relationships despite not dealing directly with the patient. *See Breen v. Myers*, No. 07-96-0095-CV, 1996 WL 686900, at *5–7 (Tex. App.—Amarillo Nov. 27, 1996, no writ) (not designated for publication) (finding summary judgment evidence sufficient to prove existence of physician–patient relationship where laboratory director of cytogenetic facility cosigned the patient's report to confirm that her lab test was done in conformity with the facility's protocols and where he admitted to reviewing the work of the lab technicians and "signing out" on karyotypes they examined); *Fence v. Hospice in the Pines*, 4 S.W.3d 476, 479–480 (Tex. App.—Beaumont 1999, pet. denied) (holding that a physician–patient relationship was formed by a hospice medical director who described his services, which included signing medical documents, as a mere formality but where the hospice's manual stated he was to take an active role in the patient's care by, in part, establishing and maintaining the patient's plan of care, and reviewing that plan periodically with the medical team).

Before examining Dr. Ochoa's actions regarding Ms. Avila's case, we recognize the Texas Administrative Code provision indicating that a physician assistant may only be supervised by their designated supervising physician or by a designated alternate physician. TEX. ADMIN. CODE § 185.15. The term "supervising physician" is defined in the Texas Administrative Code as a licensed physician "who has an active and unrestricted license and assumes responsibility and legal liability for the services rendered by the physician assistant, and who has notified the Medical Board of the intent to supervise a specific physician assistant and of the termination of such supervision." 22 TEX. ADMIN. CODE § 185.2(21). The Texas Administrative Code defines "alternate physician" as "[a] physician providing appropriate supervision on a temporary basis." *Id.* § 185.2(3). If a physician assistant is being supervised by an alternate physician, that physician must "affirm in writing and document through a log where the physician assistant is located, that he or she is familiar with the prescriptive authority agreements, protocols, or standing delegation orders . . . and is accountable for adequately supervising care provided . . . ." *Id.* § 185.13(d). The log must be signed by the alternate physician, acknowledging their responsibility pursuant to this section. *Id.*

It is undisputed that Dr. Al-Chalabi was PA Rincon's supervising physician and that no alternate physicians were named in accordance with the Texas Administrative Code. And, as Dr. Ochoa asserts, it is true that the Texas Administrative Code requires the designated supervising physician to remain liable for the acts of the physician assistant he supervises. 22 TEX. ADMIN. CODE § 185.15(a)(3)(B) (a supervising physician will "retain professional and legal responsibility for the care rendered by the physician assistant"). However, this section has no bearing on whether Dr. Ochoa himself formed a physician–patient relationship (in terms of potential liability for any alleged negligence of his own). In other words, we evaluate Dr. Ochoa's involvement in Ms.

8

Avila's case independent of the fact that he was not PA Rincon's legally designated supervising physician or alternate supervising physician.

### B. Is there more than a scintilla of evidence that Dr. Ochoa established a physician–patient relationship with Ms. Avila by taking an affirmative step to treat her?

Ms. Avila argues Dr. Ochoa took affirmative steps to render medical services, regardless of whether he met the Texas Administrative Code's requirements to be a supervising physician, by reviewing her x-ray; reviewing and agreeing with PA Rincon's chart assessment; and confirming PA Rincon's care plan and diagnosis. Ms. Avila's counsel also urged at oral argument that Dr. Ochoa's name appearing as the ordering physician on the medication orders and orders for an x-ray, an immobilizer, and crutches, as reflected in the record, further evinces his participation as a part of Ms. Avila's "treatment team." Dr. Ochoa argues that he reviewed and cosigned the chart after Ms. Avila left the hospital, and Ms. Avila failed to show how the cosignature constituted the practice of medicine.[5] Dr. Ochoa denied having reviewed anything outside PA Rincon's chart and points out that there is no indication of when the x-ray was reviewed by the "ED physician" or any evidence that Dr. Ochoa personally reviewed the x-ray. Further, Dr. Ochoa explains that "[t]he official interpretation of the x-ray was done by a different physician—Jonathan Bold, M.D.—at 11:30 p.m. on January 13, 2016."

When a physician evaluates information about the patient and then makes a medical decision, the physician has engaged in an affirmative step to render medical services, thereby establishing a physician–patient relationship. *See Wheeler v. Yettie Kersting Mem'l Hosp.*, 866 S.W.2d 32, 39 (Tex. App.—Houston [1st Dist.] 1993, no writ) (finding that an on-call physician

---

[5] Dr. Ochoa references the Occupation Code definition of "practicing medicine" as meaning "the diagnosis, treatment, or offer to treat a mental or physical disease or disorder or a physical deformity or injury by any system or method, or the attempt to effect cures of those conditions, by a person who: (a) publicly professes to be a physician or surgeon; or (b) directly or indirectly charges money or other compensation for those services." TEX. OCC. CODE ANN. § 151.002(13).

established a physician–patient relationship where he listened to patient's symptoms relayed to him over the phone by the hospital's nurse and then made a medical decision to have the patient transferred to another hospital). Dr. Ochoa reviewed PA Rincon's medical chart, evaluated the information contained therein, and then confirmed his diagnos(es), albeit after Ms. Avila left the hospital. These actions required Dr. Ochoa to evaluate information about Ms. Avila's condition and make a medical decision about the propriety of her treatment based on the diagnosis, which he confirmed. While Dr. Ochoa attempts to minimize the notation by his signature—"I agree with the assessment and care plan, and confirm the diagnosis(es)"—by calling it mere template language, we take the words to mean what they say. Moreover, regarding reviewing PA charts, Dr. Ochoa explained that when something in the PA's documentation raises a question or concern, he expands his review by either speaking to the PA or reviewing the nursing notes in a patient's records. Thus, we cannot take Dr. Ochoa's signature to mean nothing.

Even a physician's diagnosis and confirmation that no further treatment is warranted amounts to medical decision-making sufficient to establish the physician–patient relationship. *Lection v. Dyll*, 65 S.W.3d 696, 707, 714–15 (Tex. App.—Dallas 2001, pet. denied). In *Lection*, the neurologist diagnosed a migraine and told the ED doctor that nothing further needed to be done and that the patient could be discharged, but that the patient should follow up with him the following week. *Id.* at 699–700. Citing *Wheeler*, the court of appeals found that the neurologist's statements constituted "an evaluation of the information provided and a medical decision concerning [the patient's] need for treatment and admission to the hospital and thus [were] affirmative acts towards [the patient's] treatment." *Id.* at 707.

Dr. Ochoa distinguishes the summary judgment evidence in this case as insufficient because Ms. Avila's negligence claims are limited to what he did *after she left the ED.* Because Ms. Avila had already left the hospital when Dr. Ochoa reviewed and signed her chart, Dr. Ochoa

10

argues he could not have engaged in conduct for the purpose of treating Ms. Avila. Although Ms. Avila had been discharged an hour before Dr. Ochoa reviewed the chart, Dr. Ochoa's ratification of the diagnosis and care plan was tantamount to a medical decision that nothing further needed to be done. *See Lection*, 65 S.W.3d at 707 (stating that making a medical decision after evaluating patient information constitutes an affirmative act towards treating the patient). When asked what he would have done differently had he disagreed with what he found in the patient's chart, Dr. Ochoa answered, "Without seeing Mrs. Avila, I do not know what I would have done differently." He also stated that he would expect a PA to immediately consult him if there was suspicion of a TIA or stroke because "time is of the essence" under those conditions. Dr. Ochoa's testimony suggests that he would not have stood idly by had he detected the imminence of stroke in Ms. Avila's case after reviewing PA Rincon's chart. Thus, even if his review of the patients' medical charts prompts no further action, Dr. Ochoa is exercising his professional judgment when he reviews and cosigns a PA's notes. By confirming PA Rincon's assessment, diagnosis, and course of treatment, Dr. Ochoa engaged in medical decision-making for Ms. Avila's benefit.

Dr. Ochoa denies that reviewing medical charts and providing a cosignature constitute the practice of medicine and urges we cannot speculate as to the purpose of either. "For all we know," he argues, "the hospital cannot bill without those attestations." However, this would not change the fact that Dr. Ochoa made the attestations he did. Moreover, Ms. Avila's medical records also indicate that the "ED physician" reviewed her x-ray and that Dr. Ochoa was the provider or ordering provider for her prescription medications, x-ray, application of immobilizer, and provision and demonstration of crutches, which when viewed in a light most favorable to Ms. Avila, supports that Dr. Ochoa was part of her care team.

11

**C.** **Is there more than a scintilla of evidence that Dr. Ochoa had a contractual physician–patient relationship with Ms. Avila by virtue of the hospital's policies?**

Dr. Ochoa further argues that his signature on PA Rincon's documentation was required or "forced" by hospital rules and is therefore not evidence of a physician–patient relationship, as that relationship must be voluntary by law. And he was not Ms. Avila's physician before she went to the ED, nor did he treat her in the ED; thus, he did not agree to a physician–patient relationship with Ms. Avila.

The record contains a hospital document titled "Rules and Regulations of the Medical Staff," which sets out the rules regarding supervision of "Allied Health Professionals." These allied health professionals, such as PA Rincon, are allowed (depending on their privileges) to document in the patient record or dictated reports, and the content and intent of those reports become "the responsibility of the *supervising* Medical Staff member." However, a "medical staff member"— but not necessarily the supervising staff member—is required to cosign the allied health professionals' documentation.[6] This is the document Dr. Ochoa's counsel maintains required Dr. Ochoa to cosign PA Rincon's chart in Ms. Avila's case. In his deposition, Dr. Ochoa explained his understanding that he was required to cosign PA charts.

The fact that Dr Ochoa's actions may have been compelled by hospital policy or rules does not preclude the formation of a physician–patient relationship. *St. John*, 901 S.W.2d at 424. Physicians can be contractually bound to abide by hospital policies that abrogate their discretion to choose their patients. *Id.* ("[A] physician's agreement with a hospital may leave the physician no discretion to decline treatment of the hospital's clients" (citing *Hand v. Tavera*, 864 S.W.2d 678, 680 (Tex. App.—San Antonio 1993, no writ)).

---

[6] It is unclear why, under these hospital rules and regulations, the medical staff member who cosigns the PAs' charts is not one and the same as the respective PA's supervising medical staff member.

*Lection* is a case in point. There, the hospital's by-laws required on-call physicians to provide emergency medical care to ED patients and, when requested by the ED physician, to assume primary responsibility for the medical care of a patient requiring admission if the physician was so qualified. *Lection v. Dyll*, 65 S.W.3d 696, 709 n.10 (Tex. App.—Dallas 2001, pet. denied). Where the patient, who was allegedly discharged despite her neurological condition and consequently suffered a stroke, sued the on-call neurologist, the on-call neurologist denied the existence of a physician–patient relationship, arguing that the hospital's bylaws did not impose on him an absolute duty toward ED patients. *Id.* at 696–700, 707–08. Analogizing this case to *Hand*, the court of appeals found the hospital was obligated to treat the patient, and the neurologist was "under a contractual obligation with the hospital to assist [the emergency room physicians with their neurology problems]" while he was on call. *Id.* at 712–13. Consequently, the neurologist was left without discretion to provide his professional services, and he did provide those services,[7] thereby creating the physician–patient relationship. *Id.* at 713.

Dr. Ochoa testified that he understood his role as the attending physician in the ED included cosigning medical records created by non-physician health care providers. And pursuant to that role, he provided his electronic signature on the PA's chart for Ms. Avila, by the notation "I agree with the assessment and care plan, and confirm the diagnosis(es)." If Dr. Ochoa was in fact required to cosign PA Rincon's notes, then just as in *Lection*, this is evidence of a physician–patient relationship because Dr. Ochoa was left without discretion to review and sign, which he did approvingly as to PA Rincon's assessment, care plan, and diagnosis—an indication that he exercised professional judgment for Ms. Avila's benefit. While Dr. Ochoa's employment contract is not in the record and while his counsel explained in oral argument that Dr. Ochoa is not directly

---

[7] After being consulted by the attending physician over the telephone, the neurologist evaluated the symptoms and diagnosed a migraine, noting that "nothing further needed to be done" but that it was advisable for the patient to follow up with him the following week. *Id*. at 699–700.

employed by the hospital, he may still be compelled to be involved with medical decisions by virtue of the requirements of his work at the hospital.

Dr. Ochoa cites *Gross v. Burt*, 149 S.W.3d 213 (Tex. App.—Fort Worth 2004, pet. denied), in support of his argument that hospital rules do not create a physician–patient relationship because that would "abrogate[] [the physician's] ability to accept or decline responsibility." He relies on *Gross* for the proposition that a duty cannot be imposed on a physician who does not voluntarily agree to treat a patient. We find *Gross* distinguishable. There, parents of a premature infant sued an on-call pediatric ophthalmologist who performed a screening in the hospital on their premature infant for retinopathy of prematurity after discovering the child's blindness. *Gross*, 149 S.W.3d at 218. They argued that after the doctor's initial screening of the child, the doctor owed the child a continuing duty as the child's physician. *Id*. at 223. They supported their argument with a "Dear Parent" letter they received from a different doctor at the hospital that listed the ophthalmologist as the contacting doctor who would inform the parents of any risks to the child's vision. *Id*. at 223–24. Though the letter mentioned the ophthalmologist by name and might have been approved by him, the letter was written by a third-party practice group, not the ophthalmologist or his agents, and it was a form letter not addressed to any specific patient. *Id*. at 224. The court held that this type of form letter, standing alone, should not "constitute a continuing relationship by someone other than the writer of the letter." *Id*. That is, it would have been contrary to the voluntary nature of the physician–patient relationship to impose a duty on the ophthalmologist based on a form letter sent by a third party because it would "interfere with [the] physician's ability to decline to treat the unknown patient." *Id*.

Dr. Ochoa argues that imposing a duty on him based on hospital rules requiring him to review and cosign a colleague's documentation similarly interferes with his ability to accept or decline a patient. However, whereas a form letter sent by a third party cannot abrogate a doctor's

14

discretion to decline services, a physician's own conduct of reviewing, affirming, and cosigning a patient's medical chart pursuant to his understanding of a hospital policy requiring his cosignature as a physician provides more than a scintilla of evidence of a physician–patient relationship. In other words, unlike the form letter in *Gross*, a physician's conduct, even if only in accordance with a hospital's policy or rule, can constitute evidence of a physician–patient relationship.

In light of the principles discussed in *Hand* and *Lection*, and viewing the evidence in a light most favorable to Ms. Avila, we cannot say that Dr. Ochoa's affirmative acts were "involuntary," as they may just as well be a pre-existing agreement between Dr. Ochoa, his employer, and the hospital as to how he was to conduct his job as the attending physician with respect to ED patients who were attended to by mid-level practitioners.

## CONCLUSION

Because Ms. Avila raised a genuine issue of material fact regarding the existence of a physician–patient relationship, Dr. Ochoa's only issue on appeal is overruled. We affirm the trial court's order denying Dr. Ochoa's summary judgment motion.

LISA J. SOTO, Justice

March 27, 2024
Before Alley, C.J., Palafox and Soto, JJ.

15